## WILKERSON *v.* UTAH.

The legislative act of Utah, passed March 6, 1852, provides that a person con victed of a capital offence "shall suffer death by being shot, hanged, or beheaded," as the court may direct, or "he shall have his option as to the manner of his execution." Its Penal Code of 1876, by which all acts and parts of acts inconsistent therewith are repealed, provides that any person convicted of murder in the first degree "shall suffer death," and that " the several sections of this code, which declare certain crimes to be punishable as therein mentioned, devolve a duty upon the court authorized to pass sentence, to determine and impose the punishment prescribed." A., convicted of having, June 11, 1877, committed murder in the first degree in that Territory, was, by the proper court thereof, sentenced to be publicly shot. *Held*, that the sentence was not erroneous.

ERROR to the Supreme Court of the Territory of Utah.

The facts are stated in the opinion of the court.

Submitted by *Mr. E. D. Hoge* and *Mr. P. L. Williams* for the plaintiff in error, and by *The Solicitor-General* for the defendant in error.

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Duly organized Territories are invested with legislative power, which extends to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. Rev. Stats., sect. 1851.

Congress organized the Territory of Utah on the 9th of September, 1850, and provided that the legislative power and authority of the Territory shall be vested in the governor and legislative assembly. 9 Stat. 454.

Sufficient appears to show that the prisoner named in the record was legally charged with the wilful, malicious, and premeditated murder of William Baxter, with malice aforethought, by indictment of the grand jury in due form of law, as fully set forth in the transcript; and that he, upon his arraignment, pleaded that he was not guilty of the alleged offence. Pursuant to the order of the court, a jury for the trial of the prisoner was duly impanelled and sworn; and it appears that the jury, after a full and fair trial, found, by their verdict, that the prisoner was guilty of murder in the first degree.

Regular proceedings followed, and the record also shows that

the presiding justice in open court sentenced the prisoner as follows: That "you be taken from hence to some place in this Territory, where you shall be safely kept until Friday, the fourteenth day of December next; that between the hours of ten o'clock in the forenoon and three o'clock in the afternoon of the last-named day you be taken from your place of confinement to some place within this district, and that you there be publicly shot until you are dead."

Proceedings in the court of original jurisdiction being ended, the prisoner sued out a writ of error and removed the cause into the Supreme Court of the Territory, where the judgment of the subordinate court was affirmed. Final judgment having been rendered in the Supreme Court of the Territory, the prisoner sued out the present writ of error, the act of Congress providing that such a writ from this court to the Supreme Court of the Territory will lie in criminal cases where the accused is sentenced to capital punishment or is convicted of bigamy or polygamy. 18 Stat. 254.

Appended to the proceedings is the assignment of error imputed to the court below, which is repeated in the same words in the brief of his counsel filed since the case was removed into this court. No exception was taken to the proceedings in either court prior to the sentence, the assignment of error being that the court below erred in affirming the judgment of the court of original jurisdiction and in adjudging and sentencing the prisoner to be shot to death.

Murder, as defined by the Compiled Laws of the Territory, is the unlawful killing of a human being with malice aforethought, and the provision is that such malice may be express or implied. Comp. Laws Utah, 1876, 585. Express malice is when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature, and it may be implied when there is no considerable provocation, or when the circumstances attending the killing show an abandoned or malignant heart.

Criminal homicide, when perpetrated by a person lying in wait, or by any other kind of wilful, deliberate, malicious, and premediated killing, or which is committed in the perpetration or attempt to perpetrate any one of the offences therein enu-

merated, and evidencing a depraved mind, regardless of human life, is murder in the first degree. Id. 586.

Provision is also made that every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the penitentiary for life, at the discretion of the court; and that every person guilty of murder in the second degree shall be imprisoned at hard labor in the penitentiary for not less than five nor more than fifteen years. Comp. Laws Utah, 1876, 586.

Duly convicted of murder in the first degree as the prisoner was by the verdict of the jury, it is conceded that the existing law of the Territory provides that he "shall suffer death;" nor is it denied that the antecedent law of the Territory which was in force from March 6, 1852, to March 4, 1876, provided that "when any person shall be convicted of any crime the punishment of which is death, . . . he shall suffer death by being shot, hung, or beheaded, as the court may direct," or as the convicted person may choose. Sess. Laws Utah, 1852, p. 61; Comp. Laws Utah, 1876, 564.

When the Revised Penal Code went into operation, it is doubtless true that it repealed that provision, as sect. 400 provides that "all acts and parts of acts" heretofore passed "inconsistent with the provisions of this act be and the same are hereby repealed." Comp. Laws Utah, 651.

Assume that sect. 124 of the prior law is repealed by the Revised Penal Code, and it follows that the existing law of the Territory provides that every person guilty of murder in the first degree shall suffer death, without any other statutory regulation as to the mode of executing the sentence than what is found in the following enactment of the Revised Penal Code. Sect. 10 provides that "the several sections of this code, which declare certain crimes to be punishable as therein mentioned, devolve a duty upon the court authorized to pass sentence to determine and impose the punishment prescribed." Comp. Laws Utah, 1876, 567.

Construed as that provision must be in connection with the enactment that every person guilty of murder in the first degree shall suffer death, and in view of the fact that the laws of the Territory contain no other specifie regulation as to the

mode of executing such a sentence, the court here is of the opinion that the assignment of error shows no legal ground for reversing the judgment of the court below. Authority to pass such a sentence is certainly not possessed by the circuit courts of the United States, as the act of Congress provides that the manner of inflicting the punishment of death shall be by hanging. Rev. Stat., sect. 5325.

Punishments of the kind are always directed by the circuit courts to be inflicted in that manner, but organized Territories are invested with legislative power which extends to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. By virtue of that power the legislative branch of the Territory may define offences and prescribe the punishment of the offenders, subject to the prohibition of the Constitution that cruel and unusual punishments shall not be inflicted. Story, Const. (3d ed.), sect. 1903.

Good reasons exist for supposing that Congress never intended that the provision referred to, that the punishment of death shall be by hanging, should supersede the power of the Territories to legislate upon the subject, as the congressional provision is a part of the first crimes act ever passed by the national legislature. 1 Stat. 114. Different statutory regulations existed in the Territory for nearly a quarter of a century, and the usages of the army to the present day are that sentences of the kind may in certain cases be executed by shooting, and in others by hanging.

Offences of various kinds are defined in the rules and articles of war where the offender, if duly convicted, may be sentenced to the death penalty. In some of those cases the provision is that the accused, if convicted, shall suffer death, and in others the punishment to be awarded depends upon the finding of the court-martial; but in none of those cases is the mode of putting to death prescribed in the articles of war or the military regulations. Art. 96 provides that no person shall be sentenced to suffer death except by the concurrence of two-thirds of the members of a general court-martial, and in the cases specified in the rules and articles enacted by Congress. Rev. Stat., p. 238.

Repeated instances occur where the death penalty is pre-

scribed in those articles; but the invariable enactment is that the person guilty of the offence shall suffer death, without any specification as to the mode in which the sentence shall be executed, and the regulations of the army are as silent in that respect as the rules and articles of war. Congress having made no regulations in that regard, the custom of war, says a learned writer upon the subject, has, in the absence of statutory law, determined that capital punishment be inflicted by shooting or hanging; and the same author adds to the effect that mutiny, meaning mutiny not resulting in loss of life, desertion, or other military crime, if a capital offence, is commonly punished by shooting; that a spy is always hanged, and that mutiny, if accompanied by loss of life, is punished in the same manner, — that is, by hanging. Benet, Courts-Martial (5th ed.), 163.

Military laws, says another learned author, do not say how a criminal offending against such laws shall be put to death, but leave it entirely to the custom of war; and his statement is that shooting or hanging is the method determined by such custom. DeHart, Courts-Martial, 196. Like the preceding author, he also proceeds to state that a spy is generally hanged, and that mutiny unaccompanied with loss of life is punished by the same means; and he also concurs with Benet, that desertion, disobedience of orders, or other capital crimes are usually punished by shooting, adding, that the mode in all cases, that is, either shooting or hanging, may be declared in the sentence.

Corresponding rules prevail in other countries, of which the following authorities will afford sufficient proof: Simmons, Courts-Martial (5th ed.), sect. 645; Griffith, Military Law, 86.

Capital punishment, says the author first named, may be either by shooting or hanging. For mutiny, desertion, or other military crime it is commonly by shooting; for murder not combined with mutiny, for treason, and piracy accompanied with wounding or attempt to murder, by hanging, as the sentence in England must accord with the law of the country in regard to the punishment of offenders. Exactly the same views are expressed by the other writer, which need not be reproduced.

Cruel and unusual punishments are forbidden by the Constitution, but the authorities referred to are quite sufficient to

show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that category, within the meaning of the eighth amendment. Soldiers convicted of desertion or other capital military offences are in the great majority of cases sentenced to be shot, and the ceremony for such occasions is given in great fulness by the writers upon the subject of courts-martial. Simmons, sects. 759, 760; DeHart, pp. 247, 248.

Where the conviction is in the civil tribunals, the rule of the common law was that the sentence or judgment must be pronounced or rendered by the court in which the prisoner was tried or finally condemned, and the rule was universal that it must be such as is annexed to the crime by law. Of these, says Blackstone, some are capital, which extend to the life of the offender, and consist generally in being hanged by the neck till dead. 4 Bl. Com. 377.

Such is the general statement of that commentator, but he admits that in very atrocious crimes other circumstances of terror, pain, or disgrace were sometimes superadded. Cases mentioned by the author are, where the prisoner was drawn or dragged to the place of execution, in treason; or where he was embowelled alive, beheaded, and quartered, in high treason. Mention is also made of public dissection in murder, and burning alive in treason committed by a female. History confirms the truth of these atrocities, but the commentator states that the humanity of the nation by tacit consent allowed the mitigation of such parts of those judgments as savored of torture or cruelty, and he states that they were seldom strictly carried into effect. Examples of such legislation in the early history of the parent country are given by the annotator of the last edition of Archbold's Treatise. Arch. Crim. Pr. and Pl. (8th ed.) 584.

Many instances, says Chitty, have arisen in which the ignominious or more painful parts of the punishment of high treason have been remitted, until the result appears to be that the king, though he cannot vary the sentence so as to aggravate the punishment, may mitigate or remit a part of its severity. 1 Chitt. Cr. L. 787; 1 Hale, P. C. 370.

Difficulty would attend the effort to define with exactness

the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution.   Cooley, Const. Lim. (4th ed.) 408; Wharton, Cr. L. (7th ed.), sect. 3405.

Concede all that, and still it by no means follows that the sentence of the court in this case falls within that category, or that the Supreme Court of the Territory erred in affirming the judgment of the court of original jurisdiction.   Antecedent to the enactment of the code which went into operation March 4, 1876, the statute of the Territory passed March 6, 1852, provided that when any person was convicted of any capital offence he shall suffer death by being shot, hanged, or beheaded, as the court may direct, subject to the qualification therein expressed, to the effect that the person condemned might have his option as to the manner of his execution, the meaning of which qualification, as construed, was that the option was limited to the modes prescribed in the statute, and that if it was not exercised, the direction must be given by the court passing the sentence.

Nothing of the kind is contained in the existing code, and the legislature in dropping the provision as to the option failed to enact any specific regulation as to the mode of executing the death penalty.   Instead of that, the explicit enactment is that every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the penitentiary for life, at the discretion of the court.

Beyond all question, the first clause of the provision is applicable in this case, as the jury gave no such recommendation as that recited in the second clause, the record showing that their verdict was unconditional and absolute, from which it follows that the sentence that the prisoner shall suffer death is legally correct.   Comp. Laws Utah, 1876, p. 586.

Had the statute prescribed the mode of executing the sentence, it would have been the duty of the court to follow it, unless the punishment to be inflicted was cruel and unusual,

within the meaning of the eighth amendment to the Constitution, which is not pretended by the counsel of the prisoner. Statutory directions being-given that the prisoner when duly convicted shall suffer death, without any statutory regulation specifically pointing out the mode of executing the command of the law, it must be that the duty is devolved upon the court authorized to pass the sentence to determine the mode of execution and to impose the sentence prescribed. Id., p. 567.

Persons guilty of murder in the first degree "shall suffer death," are the words of the territorial statute; and when that provision is construed in connection with sect. 10 of the code previously referred to, it is clear that it is made obligatory upon the court to prescribe the mode of executing the sentence of death which the code imposes where the conviction is for murder in the first degree, subject, of course, to the constitutional prohibition, that cruel and unusual punishment shall not be inflicted.

Other modes besides hanging were sometimes resorted to at common law, nor did the common law in terms require the court in passing the sentence either to prescribe the mode of execution or to fix the time or place for carrying it into effect, as is frequently if not always done in the Federal circuit courts. At common law, neither the mode of executing the prisoner nor the time or place of execution was necessarily embodied in the sentence. Directions in regard to the former were usually given by the judge in the calendar of capital cases prepared by the clerk at the close of the term; as, for example, in the case of murder, the direction was "let him be hanged by the neck," which calendar was signed by the judge and clerk, and constituted in many cases the only authority of the officer as to the mode of execution. 4 Bl. Com. 404; Bishop, Cr. Proc. (2d ed.), sects. 1146–1148; Bishop, Cr. L. (6th ed.), sect. 935.

Reference is made to the cases of *Hartung* v. *The People* (22 N. Y. 95), *The People* v. *Hartung* (23 How: Pr. (N. Y.) 314), *Same* v. *Same* (26 id. 154), and *Same* v. *Same* (28 id. 400), as supporting the theory of the prisoner that the court possessed no authority to prescribe the mode of execution; but the court here is entirely of a different opinion, for the reasons already given.

*Judgment affirmed.*