[Crim. No. 614.   Third Appellate District.—April 10, 1922.]

## In the Matter of the Application of BETTY CAREY for a Writ of Habeas Corpus.

[1] CRIMINAL LAW—INDETERMINATE SENTENCE—JURISDICTION OF POLICE AND JUSTICES' COURTS.—Police and justices' courts have power to commit offenders to a reformatory for an indeterminate period.

[2] ID.—DURATION OF TERM.—The power of police and justices' courts to commit offenders to reformatories for an indeterminate period is not limited to the longest period for which they might be committed to the county jail.

[3] ID. — DETENTION AT CALIFORNIA INDUSTRIAL FARM FOR WOMEN — CONSTITUTIONALITY OF PUNISHMENT. — The detention of fallen women at the California Industrial Farm for Women for the purpose of reformation and assistance, in conformity with the provisions of the act establishing said farm (Stats. 1919, p. 246), does not constitute cruel and inhuman punishment.

[4] ID.—LIMITATION OF ACT TO WOMEN—CONSTITUTIONAL LAW.—The act of the legislature establishing the California Industrial Farm for Women (Stats. 1919, p. 246), is not unconstitutional because of the fact that it is applicable only to women.

[5] ID.—SOLICITING FOR PROSTITUTION—PANDERING—DISCRIMINATION AS TO PUNISHMENT.—The words "soliciting for prostitution" refer only to the act of a fallen woman in hailing passers-by and soliciting them to patronize her business, and since a woman only can be guilty of that act, a different punishment may be provided than is provided for a man who acts as a "capper" for a house of prostitution and who commits the crime known as "pandering," the punishment for which is provided in section 318 of the Penal Code.

PROCEEDING in Certiorari to secure the release of a woman committed to the California Industrial Farm for Women.   Writ discharged and petitioner remanded.

The facts are stated in the opinion of the court.

C. E. McLaughlin and C. P. McLaughlin for Petitioner.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PREWETT, J., *pro tem.*—Betty Carey, in whose behalf this proceeding is instituted, was, by a judgment of the

police court of the city and county of San Francisco, committed to the California Industrial Farm for Women in conformity with the provisions of section 8 of an act establishing said farm. (Stats. 1919, p. 246.) She will be referred to in this opinion as the petitioner.

An ordinance of said city and county provides as follows:

"Sec. 1. It shall be unlawful for any person on any public street or highway or elsewhere to solicit . . . for the purpose of prostitution.

"Sec. 2. Any person violating the provisions of this ordinance shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine not to exceed $100 or by imprisonment not more than fifty days, or by both such fine and imprisonment."

The petitioner was convicted of the offense denounced in said ordinance, and upon appearing for sentence the following judgment was entered:

"The court renders its judgment: That, whereas, the said defendant having been duly convicted in this court of the crime of misdemeanor, to wit: Soliciting prostitution, . . .

"It is ordered and adjudged that the said defendant be committed to the California Industrial Farm for Women under section 8, chapter 165, Statutes 1919."

The petitioner is detained at said farm under said judgment on a commitment that amounts, in effect, to an indeterminate sentence. She claims that the judgment in question is void, and she assigns in support of this contention a number of reasons, among which are that it is beyond the jurisdiction of the police court to sentence a defendant to the farm upon an indeterminate sentence, which might amount to a detention for the period of five years; that the punishment is cruel and unusual; that the act is discriminatory in that it applies only to women and that the legislature cannot, by general enactment, modify an ordinance of said city and county.

Those portions of the act that are material to the points under examination read as follows:

"Sec. 1. There shall be established within this state an institution for the confinement, care and reformation of delinquent women, to be known as the California Industrial Farm for Women.

"Sec. 2. The purpose of said institution shall be to provide custody, care, protection, industrial and other training and reformatory help for delinquent women. . . .

"Sec. 8. When any woman, eighteen years of age or over, is found guilty by any court within this state of prostitution, soliciting for prostitution, keeping a house of ill fame or residing in such house, frequenting any dance hall, hotel, rooming house or other public place, for the purpose of prostitution, or of vagrancy because of being a common prostitute, or a common drunkard, she shall in lieu of any other sentence or disposition provided by law, be committed by the court in which she is so found guilty to said institution for an indeterminate period of not less than six months nor more than five years. . . .

"Sec. 14. Every woman received by said institution shall be examined mentally and physically and shall, if retained by said institution, be given the care, treatment and training adapted to her particular condition. Such care, treatment and training shall be along the lines best suited to develop her mentality, character and industrial capacity to a point where she can be honorably discharged from the institution with reasonable safety and benefit to herself and to the public at large. Upon her reaching such point, in the judgment of the board of trustees, she shall be honorably discharged from the institution. . . . "

Further provision is made that the person must, in any event, be discharged from the institution upon the expiration of the period for which she was committed.

The following provisions of the federal and state constitutions are cited by petitioner in support of her writ:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside. No state shall make or enforce any laws which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction equal protection of the laws." (Sec. 1, art. XIV, Federal Const.)

"Sec. 11, art. I. All laws of a general nature shall have a uniform operation." (Cal. Const.)

"Sec. 13, art. I. No person shall be . . . deprived of life, liberty or property without due process of law." (Cal. Const.)

"Sec. 25, art. IV. The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: . . . Second, For the punishment of crimes and misdemeanors; . . . Thirty-third, In all other cases where general laws can be made applicable." (Cal. Const.)

It is clear that the petitioner is held under a commitment for an indeterminate period. Such a commitment, after an extended examination of the question, was upheld by the supreme court in *In re Lee*, 177 Cal. 690 [171 Pac. 958], wherein the court says: "It is generally recognized by the courts and by modern penologists that the purpose of the indeterminate sentence law, like other modern laws in relation to the administration of the criminal law, is to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing. . . . It has uniformly been held that the indeterminate sentence is in legal effect a sentence for the maximum term."

### THE POLICE COURT JUDGMENT.

[1] It is insisted that, although a superior court might commit a prisoner for an indeterminate period, such power is not vested in the police court. But the power of police and justices' courts to commit offenders to reformatories, in cases authorized by the legislature, is upheld in the cases hereinafter cited. This power is so clear that we would abandon further examination of the matter, if no other points were involved.

[2] It is further claimed, however, that, even though a commitment to a reformatory might be upheld, still, the police court could not commit the offender for a longer period than the longest period for which she might be committed to the county jail. This claim is equally untenable. In truth, every point urged in support of this writ has been decided adversely to the contentions of the petitioner, save one. This point will be noticed further along.

In one case in which a minor was committed to the industrial school by the police court of said city and county, the supreme court, in commenting upon the case, says:

"The action of the police judge here in question did not amount to a criminal prosecution, nor to proceedings against the minor according to the course of the common law, in which the right of trial by jury is guaranteed. The purpose in view is not punishment for the' offense done, but reformation and training of the child to habits of industry, with a view to his future usefulness when he shall have been reclaimed to society or shall have attained his majority. . . . The restraint imposed upon him by public authority is in its nature and purpose the same which, under other conditions, is habitually imposed by parents, guardians of the person and others exercising supervision and control over the conduct of those who are by reason of infancy, lunacy or otherwise, incapable of properly controlling themselves." (*Ex parte Ah Peen,* 51 Cal. 280.)

John Liddell, a minor, was found guilty of the crime of petit larceny and was sentenced by a justice's court to serve one year in the reform school. The court, in upholding the action of the justice's court, says:

"There can be no question as to the power of the legislature to provide for the detention and education of juvenile offenders as is done in this act; and the provisions of the act are not obnoxious to the criticism that it prescribes unjust or unequal penalties. It is true, the term of detention at the reform school may be made greater by the judgment of the court than the term of imprisonment in the county jail or in the state prison for the same offense would be; but it cannot be said that the punishment inflicted is greater than could be put upon an adult for the same offense. The object of the act is not punishment, but reformation, discipline and education. While detained for a longer period, perhaps, than he would be if sent to the state prison or the county jail, the conditions surrounding the child are vastly different. He is given the opportunity and instruction to learn a trade and qualify himself for the duties of citizenship, so that at the end of his term he will go out prepared to take care of himself and those dependent upon him, without the odium which attaches to an ex-convict. . . . It is equally clear that the state may arrest

the downward tendency of those who have offended against its laws and manifested a disposition to follow a criminal career by placing them in an institution where they will receive the care, education and discipline necessary to prepare them for honorable citizenship.'' (*Ex parte Liddell,* 93 Cal. 633 [29 Pac. 251].)

''Petitioner assails the constitutionality of said statute, mainly upon the grounds that it is unequal in its operation because under it an adult can be punished for petit larceny for only six months, while a minor may, for the same offense be sent to said school for a much longer period; that a justice's court has no jurisdiction in such a case to impose imprisonment for more than six months; that the statute is a special law regulating jurisdiction of justices' courts. These and similar objections to the statute are answered against petitioner's contention by the case of *Ex parte Liddell,* 93 Cal. 633 [29 Pac. 251].'' (*Ex parte Nicholls,* 110 Cal. 651 [43 Pac. 9].)

*Ex parte Ah Peen, supra,* was approved by this court in the *Matter of O'Connor,* 29 Cal. App. 234 [155 Pac. 115]. In no case have we found any criticism of the foregoing authorities. They enunciate the principles that must govern this court in the disposition of this matter.

### CRUEL AND UNUSUAL PUNISHMENT.

[3] This claim may be dismissed with the statement that the detention provided for in the statute is not, within the purview of the constitution, punishment at all. It is not a penalty. Indeed, it is wholly for purposes of assistance and reformation. Whether or not the detention is an unwarranted interference with personal liberty, it seems clear that it does not constitute cruel and unusual punishment. (*People* v. *Oppenheimer,* 156 Cal. 733 [106 Pac. 74]; *In re O'Shea,* 11 Cal. App. 568 [105 Pac. 776]; *Wilkerson* v. *Utah,* 99 U. S. 130 [25 L. Ed. 345, see, also, Rose's U. S. Notes]; *Ex parte Kemmler,* 136 U. S. 436 [34 L. Ed. 519, 10 Sup. Ct. Rep. 930].)

### UNEQUAL PRIVILEGES AND IMMUNITIES.

[4] Petitioner points out that the statute denies to women certain privileges and immunities granted to men, thereby violating the fourteenth amendment and other constitutional guaranties. It is quite certain that the statute

is applicable only to women, and if, in fact, it makes discriminations against them in particulars not warranted by natural or other conditions, it violates the constitutional guaranties of equal protection to all. It should be noted that the state has never claimed that it does not discriminate with reference to women; though, happily, it is believed that these discriminations are enacted mainly in their own interest. It is accepted law that a state may discriminate in favor of women (or against them, according to the point of view) with reference to hours of labor. (*Miller* v. *Wilson*, 236 U. S. 373 [L. R. A. 1915F, 829, 59 L. Ed. 628, 35 Sup. Ct. Rep. 342, see, also, Rose's U. S. Notes].) This case is found reported in 162 Cal. 687 [124 Pac. 427]. It enunciates many important principles applicable to the case at bar. The following quotations are taken therefrom:

"Although this guaranty of the constitution is apparently absolute and unqualified, yet it is well established that it is subject to the exercise, by the legislature, of what are known as the police powers of the state. . . .

"The injury must be of such a character and extent and to such a number of persons that it may be reasonably supposed that it will cause injury to others, that is, to the community in general, or, as it is expressed, to the public health and general welfare. . . .

"(Quoting.) 'If, therefore, a statute purporting to have been enacted to preserve public health, the public morals or the public safety, has no real or substantial relations to these objects or is a palpable invasion of rights secured by the fundamental law, it is the duty of the court so to adjudge and thereby give effect to the constitution.' . . .

"So, also, it has been recognized that some occupations followed by women, though less arduous than those generally followed by men, may have such a tendency to injure their health, if unduly prolonged, that laws may be enacted restricting the time of labor therein to ten hours per day. The application of these laws exclusively to women is justified on the ground that they are less robust in physical organization and structure than men, that they have the burden of child-bearing, and, consequently, that the health and strength of posterity and the public in general is presumed to be enhanced by preserving and protecting women

from exertion which men might bear without detriment to the general welfare. (Citing many cases.) . . .

"We must take this statute as a law intended for a police regulation to preserve, protect or promote the general health and welfare."

This case, as exemplified by the supreme court of this state and the supreme court of the United States on writ of error, establishes two very important principles, namely, that legislation may be directed to women as a class and that they may be segregated into groups or subclasses in the interests of public health, safety, or morals. And these two principles lie at the foundation of the legislation attacked by the petitioner.

However, we are not driven to the necessity of determining whether the legislature may, in the exercise of its power to protect the general health, morals, or safety, provide one punishment for a man and another punishment or remedy as against a woman; for, as we shall show further along, the crime committed by the petitioner is one that cannot be committed by a man.

The question is narrowed down to this: Does the state have the lawful right to seize its fallen women and confine them for purposes of reformation and assistance? That it may seize and confine minors, morons, lunatics, criminals, and persons addicted to the excessive use of drugs and liquors is not questioned. The first and last enumerated classes are confined solely for purposes of reformation and assistance. It is insisted that the state, if it confine its fallen women, for purposes of reformation, should make like provision for dealing with those of the opposite sex. But the difficulty is that men cannot commit the crime of carrying on the business of prostitution, except as accessories, and therefore no general rule on the subject could be made to apply to both sexes. The fallen woman alone carries on the traffic. If others prey upon her frailty, it is only with her co-operation—willing or unwilling.

The relation sustained by the fallen woman to her business and society at large is altogether unlike that sustained by her partner in crime. She follows a business that can be carried on only by women. The most casual observer cannot fail to see a vast difference between fallen women as a class and the balance of the human kind. They stand

apart. No other body of malefactors constitute so distinctly a class as do the fallen women. They present a greater single element of economic, social, moral, and hygienic loss than is the case with any other single criminal class.

Not only do they constitute a menace to the morals and social welfare of mankind, but they carry very unusually heavy pathological liabilities. In truth, from the standpoint of public health they are sometimes referred to as pestilential and their places of abode as pest houses. The law declares them to be a public nuisance. Altogether, they present the most perplexing problem with which modern penology and social legislation are called upon to deal. The fallen woman occupies a relation to society very analogous to that of the chronic typhoid carrier—a sort of clearing-house for the very worst forms of disease. The right to quarantine persons suspected of contact with infections is uniformly upheld by both state and national governments. The right to quarantine at all implies the right to continue the isolation so long as the danger remains. That a woman carrying on the business denounced in the statute is a constant pathological danger no one would question. If this be true, the fact implies the right to seize the offender and detain her, not only for mere purposes of temporary quarantine, but for the laudable purpose of reclaiming her and destroying the probability of a subsequent renewal of the danger. Though her entry upon a life of shame may often be due to social maladjustments or to the abuse of her affections, still the statute in question does not purport to deal with her as an innocent person. On the contrary, the law appraises her as so steeped in crime and in so exceptional an environment that ordinary methods of reformation and escape are impossible. Every door is closed to her. Every avenue of escape is shut off. The state, realizing this, has undertaken to take forcible charge of this class of unfortunates and extend to them a home, education, assistance, and encouragement in an effort, otherwise hopeless, to restore them to lives of usefulness. The state combines both altruism and self-preservation. Of similar import, though devoid of the shocking features, are such measures as maternity bills and acts establishing houses of refuge for homeless women.

The act is wholly identical in spirit with those provisions of law which authorize the detention and reformation of common drunkards, even though the latter, in terms, apply to all persons of either sex who are capable of becoming such. The statute assailed in this proceeding applies equally to every person who is capable of committing and who commits the offenses inhibited therein.

It is true that the statute provides that every woman carrying on the business of prostitution may be committed to the farm; but the statute would have meant exactly the same had it in terms applied to every person. The fact that the fallen woman carries on the business of commercialized vice justifies whatever discriminations may be found in the statute. The act of her partner in vice, while equally as nefarious, is neither commercialized nor continuous. It is proper enough to send him to jail for his offense, but it is doubtful if the scheme of impounding him for purposes of reformation would commend itself to the lawgiver. The conditions surrounding the two classes of offenders are so unlike that different methods of treatment are fully justified.

So superlative are the demands of civilization upon its women that discriminations in handling criminal cases may, as to them, under some circumstances, be upheld without violation of the constitutional guaranties; especially where, as here, the discrimination, in her case, withholds the penal tax and affords a more humane and beneficent line of treatment. At least, it would seem that she cannot complain of such treatment.

### THE CHARGE IN THE COMMITMENT.

[5] The specific charge against the petitioner is not that of carrying on the business of prostitution, but of soliciting for prostitution. She insists that a man, as readily as a woman, may commit this offense, and that, therefore, no discrimination in punishment can be tolerated. Even if this premise were sound, we are far from conceding the soundness of her conclusion. But the premise is not sound. The ordinance, it is true, applies to "every person." For the offense, if he could commit it, he would be sent to jail. In her case she might be committed to the farm for purposes of reformation. But a man can no more commit the offense of soliciting for prostitution than that of carrying on the business of prostitution. In one sense, possibly, it may be

said that a man who acts as a "capper" for a house of prostitution is guilty of the crime of soliciting for it. But the crime committed by others than the principal is known as "pandering" and the offender is known as a panderer, pimp, or procurer. His punishment is provided for in section 318 of the Penal Code. The words "soliciting for prostitution" have a well understood and distinct meaning. They are held to mean the act of a fallen woman in hailing passers-by and soliciting them to patronize her business. They are so understood by police officers and all others who are called upon to labor with this class of people. The various reasons which we have assigned for holding that the crime of carrying on the business of prostitution is confined to fallen woman apply with equal force to the specific charge against the petitioner.

The charge is sufficient. The writ is discharged and the petitioner remanded.

Hart, J., and Finch, P. J., concurred.