Justice Ginsburg, with whom Justice Souter joins,
dissenting.
It is undisputed that the second and third drugs used in Kentucky’s three-drug lethal injection protocol, pancuronium bromide and potassium chloride, would cause a conscious inmate to suffer excruciating pain. Pancuronium bromide *114 paralyzes the lung muscles and results in slow asphyxiation. App. 435, 437, 625. Potassium chloride causes burning and intense pain as it circulates throughout the body. Id., at 348, 427, 444, 600, 626. Use of pancuronium bromide and potassium chloride on a conscious inmate, the plurality recognizes, would be “constitutionally unacceptable.” Ante, at 53.
The constitutionality of Kentucky’s protocol therefore turns on whether inmates are adequately anesthetized by the first drug in the protocol, sodium thiopental. Kentucky’s system is constitutional, the plurality states, because “petitioners have not shown that the risk of an inadequate dose of the first drug is substantial.” Ante, at 53-54. I would not dispose of the case so swiftly given the character of the risk at stake. Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs. I would vacate and remand with instructions to consider whether Kentucky’s omission of those safeguards poses an untoward, readily avoidable risk of inflicting severe and unnecessary pain.
I
The Court has considered the constitutionality of a specific method of execution on only three prior occasions. Those cases, and other decisions cited by the parties and amici, provide little guidance on the standard that should govern petitioners’ challenge to Kentucky’s lethal injection protocol.
In Wilkerson v. Utah, 99 U. S. 130 (1879), the Court held that death by firing squad did not rank among the “cruel and unusual punishments” banned by the Eighth Amendment. In so ruling, the Court did not endeavor “to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted.” Id., at 135-136. But it was “safe to affirm,” the Court stated, that “punishments of torture . .., and all others in the same line of unnecessary cruelty, are forbidden.” Id., at 136.
*115 Next, in In re Kemmler, 136 U. S. 436 (1890), death by-electrocution was the assailed method of execution.[1] The Court reiterated that the Eighth Amendment prohibits “torture” and “lingering death.” Id., at 447. The word “cruel,” the Court further observed, “implies . . . something inhuman . . . something more than the mere extinguishment of life.” Ibid. Those statements, however, were made en passant. Kemmler’s actual holding was that the Eighth Amendment does not apply to the States, id., at 448-449,[2] a proposition we have since repudiated, see, e. g., Robinson v. California, 370 U. S. 660 (1962).
Finally, in Louisiana ex rel. Francis v. Resweber, 329 U. S. 459 (1947), the Court rejected Eighth and Fourteenth Amendment challenges to a reelectrocution following an earlier attempt that failed to cause death. The plurality opinion in that case first stated: “The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence.” Id., at 463. But the very next sentence varied the formulation; it referred to the “ [prohibition against the wanton infliction of pain.” Ibid.
No clear standard for determining the constitutionality of a method of execution emerges from these decisions. Moreover, the age of the opinions limits their utility as an aid to resolution of the present controversy. The Eighth Amendment, we have held, “‘must draw its meaning from the evolving standards of decency that mark the progress of a *116 maturing society.’” Atkins v. Virginia, 586 U. S. 304, 311— 312 (2002) (quoting Trop v. Dulles, 356 U. S. 86, 101 (1958) (plurality opinion)). Wilkerson was decided 129 years ago, Kemmler 118 years ago, and Resweber 61 years ago. Whatever little light our prior method-of-execution cases might shed is thus dimmed by the passage of time.
Further phrases and tests can be drawn from more recent decisions, for example, Gregg v. Georgia, 428 U. S. 153 (1976). Speaking of capital punishment in the abstract, the lead opinion said that the Eighth Amendment prohibits “the unnecessary and wanton infliction of pain,” id., at 173 (joint opinion of Stewart, Powell, and Stevens, JJ.); the same opinion also cautioned that a death sentence cannot “be imposed under sentencing procedures that creat[e] a substantial risk that it would be inflicted in an arbitrary and capricious manner,” id., at 188.
Relying on Gregg and our earlier decisions, the Kentucky Supreme Court stated that an execution procedure violates the Eighth Amendment if it “creates a substantial risk of wanton and unnecessary infliction of pain, torture or lingering death.” 217 S. W. 3d 207, 209, 210 (2006). Petitioners respond that courts should consider “(a) the severity of pain risked, (b) the likelihood of that pain occurring, and (c) the extent to which alternative means are feasible.” Brief for Petitioners 38 (emphasis added). The plurality settles somewhere in between, requiring a “substantial risk of serious harm” and considering whether a “feasible, readily implemented” alternative can “significantly reduce” that risk. Ante, at 52 (internal quotation marks omitted).
I agree with petitioners and the plurality that the degree of risk, magnitude of pain, and availability of alternatives must be considered. I part ways with the plurality, however, to the extent its “substantial risk” test sets a fixed threshold for the first factor. The three factors are interrelated; a strong showing on one reduces the importance of the others.
*117 Lethal injection as a mode of execution can be expected, in most instances, to result in painless death. Rare though errors may be, the consequences of a mistake about the condemned inmate’s consciousness are horrendous and effectively undetectable after injection of the second drug. Given the opposing tugs of the degree of risk and magnitude of pain, the critical question here, as I see it, is whether a feasible alternative exists. Proof of “a slightly or marginally safer alternative” is, as the plurality notes, insufficient. Ante, at 51. But if readily available measures can materially increase the likelihood that the protocol will cause no pain, a State fails to adhere to contemporary standards of decency if it declines to employ those measures.
II
Kentucky’s Legislature adopted lethal injection as a method of execution in 1998. See 1998 Ky. Acts ch. 220, p. 777, Ky. Rev. Stat. Ann. § 431.220(l)(a) (West 2006). Lawmakers left the development of the lethal injection protocol to officials in the Department of Corrections. Those officials, the trial court found, were “given the task without the benefit of scientific aid or policy oversight.” App. 768. “Kentucky’s protocol,” that court observed, “was copied from other states and accepted without challenge.” Ibid. Kentucky “did not conduct any independent scientific or medical studies or consult any medical professionals concerning the drugs and dosage amounts to be injected into the condemned.” Id., at 760, ¶3. Instead, the trial court noted, Kentucky followed the path taken in other States that “simply fell in line” behind the three-drug protocol first developed by Oklahoma in 1977. Id., at 756. See also ante, at 43, n. 1 (plurality opinion).
Kentucky’s protocol begins with a careful measure: Only medical professionals may perform the venipunctures and establish intravenous (IV) access. Members of the IV team must have at least one year’s experience as a certified medi *118 cal assistant, phlebotomist, emergency medical technician (EMT), paramedic, or military corpsman. App. 984; ante, at 55 (plurality opinion). Kentucky’s IV team currently has two members: a phlebotomist with 8 years’ experience and an EMT with 20 years’ experience. App. 273-274. Both members practice siting catheters at ten lethal injection training sessions held annually. Id., at 984.
Other than using qualified and trained personnel to establish IV access, however, Kentucky does little to ensure that the inmate receives an effective dose of sodium thiopental. After siting the catheters, the IV team leaves the execution chamber. Id., at 977. From that point forward, only the warden and deputy warden remain with the inmate. Id., at 276. Neither the warden nor the deputy warden has any medical training.
The warden relies on visual observation to determine whether the inmate “appears” unconscious. Id., at 978. In Kentucky’s only previous execution by lethal injection, the warden’s position allowed him to see the inmate best from the waist down, with only a peripheral view of the inmate’s face. See id., at 213-214. No other check for consciousness occurs before injection of pancuronium bromide. Kentucky’s protocol does not include an automatic pause in the “rapid flow” of the drugs, id., at 978, or any of the most basic tests to determine whether the sodium thiopental has worked. No one calls the inmate’s name, shakes him, brushes his eyelashes to test for a reflex, or applies a noxious stimulus to gauge his response.
Nor does Kentucky monitor the effectiveness of the sodium thiopental using readily available equipment, even though the inmate is already connected to an electrocardiogram (EKG), id., at 976. A drop in blood pressure or heart rate after injection of sodium thiopental would not prove that the inmate is unconscious, see id., at 579-580; ante, at 59 (plurality opinion), but would signal that the drug has *119 entered the inmate’s bloodstream, see App. 424,498, 578,580; 8 Tr. 1099 (May 2, 2005). Kentucky’s own expert testified that the sodium thiopental should “cause the inmate’s blood pressure to become very, very low,” App. 578, and that a precipitous drop in blood pressure would “confir[m]” that the drug was having its expected effect, id., at 580. Use of a blood pressure cuff and EKG, the record shows, is the standard of care in surgery requiring anesthesia. Id., at 539.[3]
A consciousness check supplementing the warden’s visual observation before injection of the second drug is easily implemented and can reduce a risk of dreadful pain. Pancuronium bromide is a powerful paralytic that prevents all voluntary muscle movement. Once it is injected, further monitoring of the inmate’s consciousness becomes impractical without sophisticated equipment and training. Even if the inmate were conscious and in excruciating pain, there would be no visible indication.[4]
Recognizing the importance of a window between the first and second drugs, other States have adopted safeguards not contained in Kentucky’s protocol. See Brief for Criminal *120 Justice Legal Foundation as Amicus Curiae 19-23.[5] Florida pauses between injection of the first and second drugs so the warden can “determine, after consultation, that the inmate is indeed unconscious.” Lightbourne v. McCollum, 969 So. 2d 326, 346 (Fla. 2007) (per curiam) (internal quotation marks omitted). The warden does so by touching the inmate’s eyelashes, calling his name, and shaking him. Id., at 347.[6] If the inmate’s consciousness remains in doubt in Florida, “the medical team members will come out from the chemical room and consult in the assessment of the inmate.” Ibid. During the entire execution, the person who inserted the IV line monitors the IV access point and the inmate’s face on closed-circuit television. Ibid.
In Missouri, “medical personnel must examine the prisoner physically to confirm that he is unconscious using standard clinical techniques and must inspect the catheter site again.” Taylor v. Crawford, 487 F. 3d 1072, 1083 (CA8 2007). “The second and third chemicals are injected only after confirmation that the prisoner is unconscious and after a period of at least three minutes has elapsed from the first injection of thiopental.” Ibid.
In California, a member of the IV team brushes the inmate’s eyelashes, speaks to him, and shakes him at the half *121 way point and, again, at the completion of the sodium thiopental injection. See State of California, San Quentin Operational Procedure No. 0-770, Execution by Lethal Injection, §V(S)(4)(e) (2007), online at http://www.cdcr.ca.gov/ News/docs/RevisedProtocol.pdf.
In Alabama, a member of the execution team “begin[s] by saying the condemned inmate’s name. If there is no response, the team member will gently stroke the condemned inmate’s eyelashes. If there is no response, the team member will then pinch the condemned inmate’s arm.” Respondents’ Opposition to Callahan’s Application for a Stay of Execution in Callahan v. Allen, O. T. 2007, No. 07A630, p. 3 (internal quotation marks omitted).
In Indiana, officials inspect the injection site after administration of sodium thiopental, say the inmate’s name, touch him, and use ammonia tablets to test his response to a noxious nasal stimulus. See Tr. of Preliminary Injunction Hearing in l:06-cv-1859 (SD Ind.), pp. 199-200, online at http.7/www.law.berkeley.edu/clinics/dpclinic/LethalInjection/ Public/MoralesTaylorALmicus/20.pdf (hereinhfter Timberlake Hearing).[7]
These checks provide a degree of assurance — missing from Kentucky’s protocol — that the first drug has been properly administered. They are simple and essentially costless to employ, yet work to lower the risk that the inmate will be subjected to the agony of conscious suffocation caused by pancuronium bromide and the searing pain caused by potassium chloride. The record contains no explanation why Kentucky does not take any of these elementary measures.
The risk that an error administering sodium thiopental would go undetected is minimal, Kentucky urges, because if the drug was mistakenly injected into the inmate’s tissue, not a vein, he “would be awake and screaming.” Tr. of Oral Arg. 30-31. See also Brief for Respondents 42; Brief for *122 State of Texas et al. as Amici Curiae 26-27. That argument ignores aspects of Kentucky’s protocol that render passive reliance on obvious signs of consciousness, such as screaming, inadequate to determine whether the inmate is experiencing pain.
First, Kentucky’s use of pancuronium bromide to paralyze the inmate means he will not be able to scream after the second drug is injected, no matter how much pain he is experiencing. Kentucky’s argument, therefore, appears to rest on the assertion that sodium thiopental is itself painful when injected into tissue rather than a vein. See App. 601. The trial court made no finding on that point, and Kentucky cites no supporting evidence from executions in which it is known that sodium thiopental was injected into the inmate’s soft tissue. See, e. g., Lightbourne, 969 So. 2d, at 344 (describing execution of Angel Diaz).
Second, the inmate may receive enough sodium thiopental to mask the most obvious signs of consciousness without receiving a dose sufficient to achieve a surgical plane of anesthesia. See 7 Tr. 976 (Apr. 21,2005). If the drug is injected too quickly, the increase in blood pressure can cause the inmate’s veins to burst after a small amount of sodium thiopental has been administered. Cf. App. 217 (describing risk of “blowout”). Kentucky’s protocol does not specify the rate at which sodium thiopental should be injected. The executioner, who does not have any medical training, pushes the drug “by feel” through five feet of tubing. Id., at 284, 286-287.[8] In practice sessions, unlike in an actual execution, there is no resistance on the catheter, see id., at 285; thus the executioner’s training may lead him to push the drugs too fast.
*123 “The easiest and most obvious way to ensure that an inmate is unconscious during an execution,” petitioners argued to the Kentucky Supreme Court, “is to check for consciousness prior to injecting pancuronium [bromide].” Brief for Appellants in No. 2005-SC-00543, p. 41. See also App. 30, ¶ 105(j) (Complaint) (alleging Kentucky’s protocol does not “require the execution team to determine that the condemned inmate is unconscious prior to administering the second and third chemicals”). The court did not address petitioners’ argument. I would therefore remand with instructions to consider whether the failure to include readily available safeguards to confirm that the inmate is unconscious after injection of sodium thiopental, in combination with the other elements of Kentucky’s protocol, creates an untoward, readily avoidable risk of inflicting severe and unnecessary pain.

 Hanging was the State’s prior mode of execution. Electrocution, considered “less barbarous,” indeed “the most humane” way to administer the death penalty, was believed at the time to “result in instantaneous, and consequently in painless, death.” In re Kemmler, 136 U. S. 436,443-444 (1890) (internal quotation marks omitted).

 The Court also ruled in Kemmler that the State’s election to carry out the death penalty by electrocution in lieu of hanging encountered no Fourteenth Amendment shoal: No privilege or immunity of United States citizenship was entailed, nor did the Court discern any deprivation of due process. Id., at 448-449.

 The plurality deems medical standards irrelevant in part because “drawn from a different context.” Ante, at 60. Medical professionals monitor blood pressure and heart rate, however, not just to save lives, but also to reduce the risk of consciousness during otherwise painful procedures. Considering that the constitutionality of Kentucky’s protocol depends on guarding against the same risk, see supra, at 114; ante, at 53-54 (plurality opinion), the plurality’s reluctance to consider medical practice is puzzling. No one is advocating the wholesale incorporation of medical standards into the Eighth Amendment. But Kentucky could easily monitor the inmate’s blood pressure and heart rate without physician involvement. That medical professionals consider such monitoring important enough to make it the standard of care in medical practice, I remain persuaded, is highly instructive.

 Petitioners’ expert testified that a layperson could not tell from visual observation if a paralyzed inmate was conscious and that doing so would be difficult even for a professional. App. 418. Kentucky’s warden candidly admitted: “I honestly don’t know what you’d look for.” Id,., at 283.

 Because most death penalty States keep their protocols secret, a comprehensive survey of other States’ practices is not available. See Brief for American Civil Liberties Union et al. as Amici Curiae 6-12.

 Florida’s expert in Lightbourne v. McCollum, 969 So. 2d 326 (Fla. 2007) (per curiam), who also served as Kentucky’s expert in this ease, testified that the eyelash test is “probably the most common first assessment that we use in the operating room to determine ... when a patient might have crossed the line from being conscious to unconscious.” 4 Tr. in State v. Lightbourne, No. 81-170-CF (Fla. Cir. Ct., Marion Cty.), p. 511, online at http://www.cjlf.org/files/LightbourneRecord.pdf (all Internet materials as visited Apr. 14, 2008, and in Clerk of Court’s case file). “A conscious person, if you touch their eyelashes very lightly, will blink; an unconscious person typically will not.” Ibid. The shaking and name-calling tests, he further testified, are similar to those taught in basic life support courses. See id., at 512.

 In Indiana, a physician also examines the inmate after injection of the first drug. Timberlake Hearing 199.

 The length of the tubing contributes to the risk that the inmate will receive an inadequate dose of sodium thiopental. The warden and deputy warden watch for obvious leaks in the execution chamber, see ante, at 45-46 (plurality opinion), but the line also snakes into the neighboring control room through a small hole in the wall, App. 280.