## IN THE MATTER OF THE APPLICATION OF LUCAS CANDIDO FOR A WRIT OF HABEAS CORPUS.

### No. 1994.

SUBMITTED APRIL 6, 1931.     DECIDED MAY 18. 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

(Banks, J., dissenting.)

Before a circuit judge at chambers a petition was filed by a next friend on behalf of Lucas Candido alleging: that the petitioner (Candido) was, in August, 1926, sentenced in the circuit court of the fourth circuit to a term of imprisonment in Oahu prison upon conviction of a felony and that he ever since has been and now is an inmate and prisoner in that prison; that the respondent Lane is the high sheriff of the Territory and warden of the prison; that the respondent "threatens and intends and will, unless restrained by this honorable court, inflict certain cruel and unusual punishment" on the petitioner "by flogging" him "with a cat-o'-nine-tails;" that "the said threatened flogging * * * is not pursuant to any process, judgment or decree of any competent court or tribunal of civil or criminal jurisdiction" and is illegal and in violation of the petitioner's constitutional rights. The prayer is that "to relieve the said" petitioner "of said unlawful imprisonment and detention," for the purposes of the flogging, a writ of habeas corpus be issued directed to the respondent. Upon the filing of the petition an order was issued commanding the respondent to appear at a time and place named to "show cause, if any he have, why a writ of habeas corpus should not be issued as prayed for." By the same order the respondent was commanded "in the meantime" to "desist from inflicting any corporal punishment on the" petitioner "until the further order of the court."

After intermediate proceedings questioning the correctness of the procedure followed by the petitioner and the jurisdiction of the court by habeas corpus to grant the relief prayed for, the respondent filed a return to the order to show cause. In the return, admitting his custody

of the petitioner, the respondent set forth that the petitioner was convicted in August, 1926, in the circuit court of the fourth circuit of the crime of burglary in the first degree on three charges and was sentenced to imprisonment in Oahu prison for a term of not less than five years nor more than twenty years on each charge, the sentences to run consecutively, and that the petitioner was now held by him in Oahu prison by virtue of a mittimus issued pursuant to those sentences. He further alleged that on September 12, 1929, he was authorized and directed by the board of prison inspectors for the first judicial circuit "to administer to" the petitioner "for his repeated violations of the rules and regulations governing the conduct of prisoners confined in Oahu prison, and for other wrongful and illegal conduct, not more than twenty-four lashes, the exact number of which are to be determined by respondent with the advice of the prison physician who is to be present when said lashes are administered;" that the petitioner "at all times since his commitment to said prison has been unruly, incorrigible and refractory * * *; that for various infractions and breaches of prison rules and prison discipline and for other misconduct" the petitioner "has heretofore been punished in such manner and form as said board has considered best and advisable in his best interests and for the welfare of the community and the discipline at Oahu prison; that such punishments as have heretofore been meted out" to petitioner "have not deterred him from further conduct subversive to good prison discipline, subversive to the authority of respondent, nor deterred him from committing breaches of prison rules, and that said board has determined that it would be useless again to inflict upon" the petitioner "forms of punishment which heretofore have had no restraining or beneficial influence upon him." The respondent admits that by virtue of the direction of the board of prison inspectors

and of the law he "proposes to administer to" the petitioner "not more than twenty-four lashes, in such manner and form as will not inflict serious or dangerous bodily injury, as a reasonable and necessary punishment for" the petitioner's "repeated violations of the rules and regulations governing the conduct of prisoners confined in the Oahu prison and for other wrongful and illegal conduct, and which said misbehavior has had a direct and immediate tendency to subvert the authority of respondent and to injure prison discipline."

In a traverse to the return to the order to show cause the petitioner admits that he was convicted and sentenced as in the return alleged and that in September, 1929, the respondent was directed by the board of prison inspectors to administer a flogging as in the return stated, alleges that the board "directed his flogging as punishment for his escape from Oahu prison" and "denies that at all times during his confinement at Oahu prison he has been unruly, incorrigible and refractory and in this connection alleges that his misconduct wherever the same has occurred has been the direct result of the brutal treatment accorded him by officers in charge of the prisoners."

The circuit judge decided that to whip the petitioner with the cat-o'-nine-tails would be in contravention of Article VIII of the Amendments to the Constitution of the United States which prohibits "cruel and unusual punishments" and signed and filed a "judgment" which, after a clause of recital, reads: "Now, therefore, it is hereby ordered that John C. Lane, high sheriff of the Territory of Hawaii and warden of Oahu prison, be and he is hereby ordered and directed to refrain and desist from inflicting or causing to be inflicted the punishment of flogging with a cat-o'-nine-tails on the body and person of the said Lucas Candido during his confinement in Oahu prison. And subject to the foregoing, the said Lucas Candido is re-

manded to the custody of John C. Lane, warden of Oahu prison as aforesaid." From that judgment the case comes to this court upon the appeal of the respondent.

In the view which we take upon the main issue argued in this case it is unnecessary to decide whether the writ of habeas corpus may be used to test in advance the power of the warden of Oahu prison to inflict a flogging upon an incorrigible prisoner as a disciplinary measure or the question whether, in spite of the name "habeas corpus" given to this proceeding in the various papers filed, this is not in reality a suit for an injunction and the final "judgment" is not in reality an injunction. No opinion is expressed or intimation given on either of these questions.

The following is a statement, undisputed by evidence, of the misconduct of the petitioner since his commitment to prison and of the punishments inflicted on him: January 17, 1927, escaped from prison playground; February 21, 1927, recaptured and placed in dark cell for forty-eight hours, from which he was released and placed in the emergency cell; July 12, 1927, placed in dark cell for forty-eight hours for creating disturbance in emergency cell; August 7, 1927, confined in dark cell for sawing bars of emergency cell and in conjunction with others attempting to overpower guard with clubs and to escape on the night of July 31, 1927; August 5, 1927, classified as class "C" prisoner as of August 1, 1927; August 18, 1927, placed in dark cell for forty-eight hours for destroying clothing; March 10, 1928, placed in dark cell for forty-eight hours for cutting bars of cell; April 5, 1928, upon report to the board of prison inspectors that the petitioner had attempted with the use of a smuggled saw to cut the bars of his cell and to escape, the board declared that "it was the consensus of opinion" of its members "that apparently the type of punishment now used in merely confining these

men in detention cells seems to have no effect on them" and decided "to handcuff" the petitioner "to the bars of his cell by the hands only, for a period of fifteen days from 8:00 o'clock until 11:00 in the morning, and from 1:00 o'clock until 4:00 in the afternoon, and to give him bread and water once a day and one ordinary meal a day * * * and to remove everything from his cell, giving him a canvas to sleep on, and inform him that it was the intention of the board not to put up with more of his unruly conduct in the future; that at the end of the minimum period of fifteen days he would be given a chance to show that he will behave himself, and that if he does not respond the time of this treatment will be increased. The board instructed the warden to keep in mind the health of the prisoner at all times and if the warden or the prison physician felt that the punishment was too severe to report this fact to the board."

Resuming the petitioner's history: August 6, 1928, placed in dark cell for creating disturbances in emergency cell and removing electric light bulb from corridor; August 10, 1928, for unruly conduct and creating a disturbance, ordered handcuffed to bars from 8 to 11 A. M. and 1 to 4 P. M. for fifteen days; January 27, 1929, escaped from prison; January 31, 1929, recaptured and placed in dark cell and kept there until February 7, 1929; February 8, 1929, kept handcuffed to bars by the hands from 8 to 11 A. M. and from 1 to 4 P. M. for fifteen days as punishment for escape on January 27, 1929; March 20, 1929, placed in dark cell for forty-eight hours for attempting to dig through emergency cell wall; August 18, 1929, sawed bars of cell with smuggled saw and effected his escape while wearing Oregon boot; September 9, 1929, recaptured, placed in dark cell and kept there until September 13, 1929; September 12, 1929, ordered whipped, this being the order now under review.

Chapter 111, R. L. 1925, being Act 41, L. 1905, with subsequent amendments provides for the creation of a board of prison inspectors composed of three members, for each judicial circuit, to be appointed by the governor. *Inter alia,* "each board shall have power to supervise the discipline and government of all prisons and jails within the judicial circuit for which said board is appointed; to provide such rules and regulations, not contrary to law, as in the opinion of a majority of such board are advisable for the improvement of the discipline and government of such prisons and jails; to prescribe on consultation with the warden or jailer, whenever the same can be done, arduous work to be performed by prisoners to occupy at least eight working hours each day except Sundays and holidays * * *; the punishment to be inflicted on prisoners for breach of prison rules or other misconduct." *Ib.,* § 1544. The material provision of this statute is that "each board shall have power * * * to prescribe on consultation with the warden or jailer * * * the punishment to be inflicted on prisoners for breach of prison rules or other misconduct." This language is broad. The power conferred is unlimited save by the inhibitions of the Constitution. It includes the power to order a flogging if flogging is permitted by the Constitution. There is no ambiguity in the language used. As a matter of English it is the equivalent of a provision specifically authorizing flogging as well as other forms of punishment. As early as 1859 the minister of the interior, with the approval of the King in cabinet council, was given by statute "the power to erect such suitable prisons, jails, station houses and houses of correction as may be necessary for the safe-keeping, correcting, governing and employing of all persons duly committed thereto and also with the approval of the King in cabinet council to prescribe rules and regulations for their government and discipline." In pursuance

of this provision, and even before its appearance in the Civil Code of 1859, the King in privy council on August 26, 1857, approved "Rules and Regulations for the New Prison," which included the provision that "any prisoner violating the foregoing rules and regulations will be punished by flogging, solitary confinement, placing in irons, reduction of food, shaving the head, or the pump, or shower bath, in the discretion of the chief warden." By chapter 7 of the laws of 1888 the minister of the interior, with the approval of the cabinet, was authorized to appoint a board of prison inspectors whose duty it was (section 8) "on consultation with the jailor to prescribe the punishments to be inflicted on prisoners for the breach of prison rules or other misconduct." This statute continued in force until 1905 when it was followed by Act 41 of the laws of that year. Section 4 of that Act authorized the board of prison inspectors "to prescribe on consultation with the warden or jailor the punishment to be inflicted on prisoners for breach of prison rules or other misconduct." In 1923, by Act 220, the provision was modified to read as in the quotation above from section 1544, R. L. 1925.

In other words, beginning with not later than 1859 a statutory provision relating to the subject of punishments by way of enforcing discipline in prisons, in the same broad language now to be found in section 1544, R. L. 1925, has been in existence. From time to time in all this long period of years, but in infrequent instances as properly should be the case, whippings have been administered in Oahu prison to incorrigible prisoners and the infliction of this method of punishment has passed unquestioned in the courts until the present series of proceedings was commenced. If it were necessary to resort to that aid, this long-continued contemporaneous construction by the executive department of the government of

this law entrusted to it for enforcement would be deemed material and enlightening.

Article VIII of the Amendments to the Constitution of the United States provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Assuming that whippings are not otherwise unconstitutional, it is not claimed on behalf of the petitioner that a whipping in this particular case would be excessive punishment or would be without justification. It is obvious that it is not for the courts to say whether a flogging of this petitioner is required by the history of his misconduct and of the earlier efforts of the board. at correction. It is for the board alone, if it has the authority to prescribe this mode of punishment, to say whether there is any hope of enforcing discipline at the prison or of correcting the petitioner by other and more lenient modes of punishment, or whether resort to a whipping is unavoidable and desirable. The sole question presented to this court is whether a whipping is within the constitutional prohibition against "cruel and unusual punishments."

Difficulty has been found by courts, even by the Supreme Court of the United States, in defining what are "cruel and unusual punishments" within the meaning of that expression as used in the Constitution. "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted." *Wilkerson* v. *Utah,* 99 U. S. 130, 135, 136. This was repeated with approval in the case entitled *In Re Kemmler,* 136 U. S. 436, 447. In *Weems* v. *United States,* 217 U. S. 349, 368 (1909), after saying, "what constitutes a cruel and unusual punishment has not been exactly decided," the court again repeated the comment above quoted from *Wilkerson* v. *Utah,* adding that "the law-writers are indefinite"

(p. 371). Judge Cooley in his Constitutional Limitations, 8th edition, volume 1, page 694, says: "It is certainly difficult to determine precisely what is meant by cruel and unusual punishments." In 2 Watson on the Constitution (1910) the author says: "The courts and text writers have not always found it an easy matter to determine what constitutes cruel and unusual punishment" (p. 1511).

Perhaps it is debatable whether a punishment to come within the inhibition must be both cruel and unusual or whether it is sufficient for the purpose if it is cruel or is unusual. Perhaps, also, the fact that a punishment is unusual may tend, under some circumstances at least, to show that it is also cruel and the fact that it is cruel may tend to show that it is unusual. These particular branches of the question need not be determined in a case where the punishment is found to be neither cruel nor unusual.

The choice of words for this prohibition would seem to have been unfortunate. Each of the two words "cruel" and "unusual" is susceptible of more than one meaning. Questions of degree are at once suggested in an effort to determine their meaning. When the amendment was proposed it was objected that the clause would have no certain meaning.

"The provision received very little debate in Congress. We find from the Congressional Register, p. 225, that Mr. Smith of South Carolina 'objected to the words "nor cruel and unusual punishments," the import of them being too indefinite.' Mr. Livermore opposed the adoption of the clause, saying: 'The clause seems to express a great deal of humanity, on which account I have no objection to it; but as it seems to have no meaning in it, I do not think it necessary.' " *Weems* v. *United States, supra,* p. 368. The expression "cruel and unusual punishments" was borrowed from the Bill of Rights of 1688 (*In re Kemmler,* 136

U. S. 436, 446), where it was first used in view of a history then recent and under circumstances which differed materially from any now existing.

The word "unusual" would seem at first sight to be the one of the two more easily susceptible of definition and yet it presents some difficulties. It certainly does not mean "novel." If it did, vasectomy would have been declared unconstitutional. On the contrary, it has been sustained. *State* v. *Feilen,* 70 Wash. 65. If it did, electrocution and execution by the use of lethal gas would have been declared unconstitutional. On the contrary, they have been sustained. *In re Kemmler,* 7 N. Y. S. 145; *People* v. *Durston,* 119 N. Y. 569, 576; *People* v. *Kemmler,* 119 N. Y. 580, 586, and *In re Kemmler,* 136 U. S. 436; and *State* v. *Jon,* 46 Nev. 418. Nor does it import rarity of legal authorization or of use. If it did, vasectomy, electrocution and execution by lethal gas, at a time when only one state or only a very few states adopted those modes, could not have gained recognition. No other method formerly untried could attain lawfulness. In the case of a punishment long used, but which apparently is losing popularity and is being used by fewer and fewer states, when is the point reached when it can properly be declared to be unusual? That also involves uncertainty and difficulty. The present case does not call for a precise, exhaustive definition. In our opinion a form of punishment long used by the federal government and by some of the states does not become unusual simply because the federal government and some of those same states have discarded it, a few others of the states continuing to use it.

The present constitutional provision has often been said to have been aimed at certain sanguinary, barbarous and inhuman practices which at one time prevailed in England. Some of the cases mentioned are: "Where the prisoner was drawn or dragged to the place of execution

in treason; or where he was emboweled alive, beheaded and quartered in high treason. Mention is also made of public dissection in murder and burning alive in treason committed by a female." *Wilkerson* v. *Utah*, 99 U. S. 130, 135. "It is safe to affirm that punishments of torture such as those mentioned" above, "and all others in the same line of unnecessary cruelty, are forbidden by that Amendment to the Constitution." *Ib.*, 136. In the *Kemmler* case, at page 446, the court said: "If the punishment prescribed for an offence against the laws of the State were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel or the like, it would be the duty of the courts to adjudge such penalties to be within the constitutional prohibition. And we think this equally true of the Eighth Amendment in its application to Congress."

"In England there was a time when punishment was by torture, by loading him with weights to make him confess. Traitors were condemned to be drowned, disemboweled or burned. It was the law 'that the offender shall be drawn, or rather dragged, to the gallows; he shall be hanged and cut down alive; his entrails shall be removed and burned while he yet lives; his head shall be decapitated; his body divided into four parts.' * * * For certain other offenses the offender was punished by cutting off the hands or ears, or boiling in oil or putting in the pillory. By the Roman law a parricide was punished by being sewed up in a leather sack with a live dog, a cock, a viper and an ape, and cast into the sea." *State* v. *Borgstrom*, 69 Minn. 508, 520. As the court very aptly remarked in that case, following this description of ancient penalties, "these punishments may properly be termed cruel. * * * They are prohibited by our constitution." *Ib.*, 520, 521. Similar lists of punishments that today all courts would join in declaring cruel within the meaning of

the Constitution are to be found in *State* v. *Williams*, 77 Mo. 310; *Territory* v. *Ketchum*, 10 N. M. 718, 720; and in 2 Watson on the Constitution 1510. The last named author says: "It was to prevent such punishments as have been described, except hanging, that the Amendment was adopted." *Ib.*, 1510. In *Whitten* v. *Georgia*, 47 Ga. 298, 302, the court said that the clause under consideration "was doubtless intended to prohibit the barbarities of quartering, hanging in chains, castration, etc."

"The interdict of the Constitution against the infliction of cruel and unusual punishments would apply to such punishments as amount to torture, or such as would shock the mind of every man possessed of common feeling, such, for instance, as drawing and quartering the culprit" (here naming other punishments just above recited). "It must be a very glaring and extreme case to justify the court in pronouncing a punishment unconstitutional on account of its cruelty." *State* v. *Williams, supra,* 312, 313.

In seeking a solution of the question whether whipping is cruel it must first be noted that severity alone is not cruelty. *Dutton* v. *State*, 123 Md. 386. If it were, there could be no effective punishment inflicted. One of the essentials of punishment is that it shall be effective for the accomplishment of the purposes for which it is intended and those purposes in our system of government usually are the protection of the law-abiding members of society and the reformation of the prisoner. Efforts at prescribing fines, imprisonments and other punishments may as well cease if severity is to be avoided. "Imprisonment at hard labor * * * may be severe, in the given instance, but that is a question for the law-making power. * * * The punishment, to be effective, should be such as will prove a deterrent." *State* v. *Hogan,* 63 Oh. St. 202, 218.

It is equally clear that the framers of the Constitution

could not have aimed the provision under consideration against *all* cruelty. For that also would have rendered impossible the infliction of most of the severe punishments. Practically all punishments involve cruelty,—in varying degrees though it be. There is a mild degree of cruelty in exacting even a fine from one unable or barely able to pay it. There is cruelty in casting men and women, rich or poor, sensitive or hardened, into prison and keeping them there for periods of time. There is pronounced cruelty in depriving a convicted person of life, and that, too, irrespective of the supposed physical painlessness of the method adopted for execution of that punishment. There is very marked cruelty in vasectomy in spite of its being performed under an anesthetic or of its inflicting very little physical pain. The involuntary and forcible deprivation of the power of procreation, with the mental pain involved, is beyond all doubt extremely cruel,—a consideration not referred to (probably because not within the issues) by the Supreme Court of the United States in its recent opinion in *Buck* v. *Bell,* 274 U. S. 200, sustaining as against the Fourteenth Amendment the statutes of Virginia providing for salpingectomy in cases of mental defectives. A confinement of prisoners, alone, in dark cells and severe restrictions in diet for stated periods both likewise involve distinct cruelty. Yet, with equal clearness, none of these forms of punishment are "cruel" within the meaning of that term as used in the Eighth Article of the Amendments to the Constitution. "It is not easy to define what punishments are 'cruel and unusual' within the constitutional inhibition. In a limited sense, anything is cruel which is calculated to give pain or distress and since punishment imports pain or suffering to the convict it may be said that all punishments are in some sense cruel. But, of course, the Constitution does not mean that crime for this reason is to go unpunished. On the con-

trary, it plainly contemplates that crime can only be effectively deterred by inflicting some sort of pain or suffering upon the convicted offender." *State* v. *Tomassi,* 75 N. J. L. 739, 746, 747. What then can be the guide? If it is the ascertainment of whether a punishment was in use in our country at the date (1791) of the adoption of that Article, there is certainty. History, at least, is not fluctuating or entirely lacking in certainty. It can be determined whether a given punishment was or was not in use at that time. It is contended, however, that the Article in question is "progressive" and is to be applied with reference to the views entertained at the time that the question is raised as distinguished from the views entertained at the time that the language of the Amendment was framed and adopted. Some encouragement is lent to this view by what the court said in *Weems* v. *United States, supra,* p. 378. Mr. Justice McKenna, writing the prevailing opinion of the court, said: "The clause" (this clause) "of the Constitution in the opinion of the learned commentators may be therefore progressive and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." While the case then before the court was not one of whipping, but was one of imprisonment with chains and other accessories deemed by the court plainly excessive and cruel, the same principle of progressiveness would seem to apply to a whipping. At first impression at least, one is tempted to think that the certain test is whether a punishment was deemed cruel or was in favor at the time of the adoption of the Constitution and that utter confusion and uncertainty will result if the later and best considered thought of the day becomes the true test. The latter rule, if adopted, would be easier of application under some circumstances than under others. For example, if for a period of two hundred years a punishment once common

has not been used, and if all thinking persons at the time of the judicial attack will shudder with horror at the thought of the revival of that punishment, it might be justifiable to say judicially that the punishment is cruel and prohibited by the Constitution, even though it was not so at the time of the adoption of the Amendment. On the other hand, the courts, even under the view of "progressiveness," would not be justified in declaring unconstitutional a punishment which was in common use at the date of the adoption of the Amendment and has since then become less used, but not wholly extinct, and when thinking people are divided in their views as to whether it should now be regarded as cruel. Under the last named circumstances the question in our opinion cannot be decided by a count of those who make their views known in such matters and the conclusion must be that such a punishment, once well known and commonly used, and now still used although less generally, is not cruel within the meaning of the Constitution.

There can be no doubt that in 1791 when the Eighth Amendment was framed and adopted whipping was a well known form of punishment commonly used by the executive departments of the federal government and of some of the states. "That clause" (in the Act of 1835, referring to "cruel and unusual punishments") "was not designed to include the punishment of flogging, which was not an unusual punishment when the Act of 1835 was passed. On the contrary, it was the kind of punishment then most usual and known to and sanctioned by the law."— Curtis, J., in *United States* v. *Collins*, 2 Curtis 194. It was not until the year 1839 that it was abolished for the federal courts by Act of Congress. 5 U. S. Stat. L., c. 36, § 5; Rev. Stat. 1878, § 5327. It is still authorized by law and used in Maryland for wife-beating (1 Ann. Code of Md., p. 973, § 15; *Foote* v. *State,* 59 Md. 264), and in Dela-

ware for wife-beating and other offenses. Rev. Code, Del., 1915, §§ 4814, 4703, 4707, 4712. In New Mexico it was sustained by the supreme court of that Territory as late as the year 1869. *Garcia* v. *Territory,* 1 N. M. 415. In North Carolina it was sustained as late as the year 1927 (although in the absence of a constitutional provision similar to that under consideration). *State* v. *Revis,* 136 S. E. 346, 348. In Hawaii, as above stated, it has been in unquestioned use from 1859 until attacked by this petitioner in 1929. In England, a country credited with efficiency in the administration of the criminal law and not otherwise chargeable with present-day barbarity or inhumanity, whipping is still authorized by statute as a punishment for a considerable number of offenses and also as a matter of prison discipline. 9 Halsbury's Laws of England, 411, 423, 772, 773, 792; 23 do. 257, 265, 266; 47 English & Empire Digest 478, 479.

It is true that some persons—let it be assumed, many persons—whose views are worthy of consideration and respect, now believe that whipping is a cruel punishment; but it is also true that there are other persons of prominence and ability, equally entitled to consideration and respect, who believe that it is not of that degree of cruelty which brings it within the inhibition of the Constitution. President Roosevelt in his message to Congress on December 6, 1904 (39 Congressional Record, p. 1), favored some form of corporal punishment in certain cases. Simeon E. Baldwin, formerly governor and chief justice of Connecticut and learned author, wrote in favor of its continued use. Coming nearer home, in 1929 both the senate and the house of representatives of the Territory of Hawaii passed a bill providing for the infliction of this punishment for certain sexual offenses, a large number of which had then been recently committed. The bill was vetoed by Governor Farrington. In the legislature of

1931 a bill prohibiting whipping was passed by the house of representatives but failed of passage in the senate. The adoption by the legislature in 1929 of the bill authorizing whipping was, it is well known, in part at least at the solicitation of one or more committees of women, earnest and thinking members of our community. By its failure to repeal by statute the power held, since 1859, by the prison boards or other named officials to order floggings for breaches of prison discipline, a power which with the knowledge of the legislature has been exercised from time to time as occasion seemed to demand, every successive legislature during that period of over seventy years has said as clearly and eloquently as it could have done in express words, that it is in favor of the continued existence and exercise of the power to flog.

Within a very few years last past there have been in this city of Honolulu and its suburbs what at the time were called "waves of crime," "waves" of rape and of assaults on women with intent to commit rape. It may well be that the prompt infliction of a whipping on the perpetrators, if such whipping were authorized by law, would be quite efficacious in preventing the continuation or repetition of such a wave. If a whipping as a method of enforcing prison discipline is within the inhibition of the Constitution, so would a whipping be which is prescribed by courts by way of punishment for crime. Why should the thought of temporary physical pain prevent the infliction of that mode of punishment on offenders who have by their physical assaults ruthlessly caused to women the most distressing mental pain and anguish?

The whipping of children by parents is still practiced and the whipping of children by teachers is permitted under our laws and has been upheld by this court. *Territory v. Cox*, 24 Haw. 461. It may be said that whippings administered by parents are restrained in severity by the

love of those parents for their children. That is true; but it is a whipping nevertheless and it inflicts pain of varying degrees and many people, perhaps most people, would say that it is cruel. A whipping by a teacher is restrained by the desire of that official to further the well-being of his pupils and the success of the school, but it is not a restraint comparable to that imposed by the love of the parent. But whatever the degree of the restraint in the case of the teacher, the punishment is nevertheless a whipping, inflicting pain and involving some cruelty. As long as whippings by parents are deemed necessary and justifiable and are sustained, as long as whippings by teachers are deemed necessary and justifiable and are sustained, and as long as policemen are lawfully permitted to use wooden clubs (on heads if necessary) on rioters and persons resisting arrest and to use tear gas bombs in dispersing unlawful assemblies, how can it be said that the whipping of a prisoner, incorrigible and unaffected by any other known and more lenient form of punishment and admonition, is unnecessarily and unjustifiably cruel? If the whipping is the only manner in which the message intended to be conveyed to his mind and reason can be conveyed, then it cannot be deemed cruel within the meaning of the Constitutional Amendment. There cannot be one less sensitive standard of measurement as to whippings when we consider children (substantially innocent when compared with a hardened criminal) and another and more sensitive standard with reference to full-grown and incorrigible inmates of prisons, lawfully detained to serve sentences lawfully imposed. The physical pain caused by a whipping, whether with or without a cat-o'-nine-tails, is temporary only. It soon passes away, at most in a very few days. This the undisputed evidence in the case at bar shows. Is such a punishment, temporarily painful and soon recovered from physically, comparable

in the degree of cruelty involved to a total deprivation of life? Is it comparable to the forcible and unwanted deprivation of the power of procreation? We think not.

Bearing in mind the fundamental rule that a law is not to be declared invalid unless it is clearly unconstitutional, it is our opinion that the form of punishment now under consideration, which was clearly constitutional at the date of the passage of the Amendment and has since had the history above recited, cannot now be declared unconstitutional. If it is the opinion of the individual judges who are called upon to decide the matter at any particular time that must determine whether a punishment is cruel, then the result in the case at bar must be the same, for it is our opinion that whipping, while doubtless inflicting some cruelty, is not cruel within the meaning of that provision and was not intended by the framers of the Constitution to be prohibited. We believe in its efficacy with criminals of a certain class. When administered to a prisoner who knows no other language it may well be justifiable. When properly inflicted it need not be sanguinary. The evidence in the case at bar shows that in Hawaii its infliction is not sanguinary. The history above recited shows that it is not barbarous and inhuman so as to shock all thinking persons, although undoubtedly it does shock some of them. If forms of punishment were to be declared prohibited by the Constitution because their cruelty shocks the conscience of some thinking persons, there would be very little punishment today and crime in all probability would go substantially unchecked. We must be practical and assure to the law-abiding members of the community protection in their lives, in their bodies, in their property and their happiness, even though the accomplishment of that object involves the infliction of some considerable physical pain upon those who flagrantly and

persistently violate our laws and the indispensable discipline of our prisons.

What has been here said applies as well to a whipping with a cat-o'-nine-tails as to a whipping by other known forms.

The judgment appealed from is reversed and the petitioner is remanded to the custody of the respondent.

*E. J. Botts* for petitioner.

*H. R. Hewitt,* Attorney General, and *E. R. McGhee,* Deputy Attorney General, for respondent.

### DISSENTING OPINION OF BANKS, J.

If a court having authority over my judgment had declared that whipping with a cat-o'-nine-tails, as a means of enforcing prison discipline, was not cruel and unusual punishment, I would consider myself under compulsion to obey its mandate. No such court, however, has so expressed itself. Or if the people of this Territory, speaking through their assembled legislative representatives, had so expressed themselves, I would hesitate to disagree with them. In the cases from Maryland, New Mexico, North Carolina and Virginia, referred to in the majority opinion, the conclusion of the courts that whipping was not a cruel and unusual punishment seems to have been influenced by the fact that in those jurisdictions it was authorized by legislative enactment. Our legislature, however, has taken no such action and I therefore feel free from this constraint. The direction to the high sheriff to whip the petitioner in the instant case issued not from the legislature but from a board of prison inspectors, composed of three members who held their office not by popular mandate but under executive appointment. It cannot be said of them, therefore, that they presumptively represented the wishes of the people. Under these circumstances I feel at liberty to express my own views.

I am much impressed by the following extract taken from the opinion written by the chief justice of North Carolina in *State v. Nipper*, 166 N. C. 272, 275: "Originally, flogging was recognized as a proper punishment in the armies and navies of the world. But it has long since been abolished in those services everywhere, notwithstanding the protests of officials who declared that the result would be mutiny and disorganization. Flogging has been long since abolished as a part of prison discipline by all the great and enlightened nations of the world, except Russia. In England, France, Germany, Austria, Italy, Belgium, Holland, Switzerland, Spain, and by the government of the United States, and even in Mexico and in most other civilized countries, the lash as an adjunct of prison discipline has long since been forbidden. In Mexico, in 1903, Art. 385 was adopted: 'The lash or any other violent physical punishment shall not be employed' either as a sentence of the court or as a part of prison discipline. This has been taken substantially from the statutes obtaining in the more advanced countries. The statute in New York provides: 'No guard in any prison shall inflict any blows whatsoever upon any prisoner, unless in self-defense or to suppress a revolt or insurrection.' Statutes or regulations to the same effect abolishing flogging prevail in all the northern and western States, 32 out of 48, and it is there looked upon as a survival of barbarism. In many of the southern States, as in Maryland, District of Columbia, West Virginia, Oklahoma, Tennessee, Texas, and others, it has also been abolished and prohibited. This is one of the very few States in which it has been retained, and here not by authority of law, but as a matter of custom, and is the survival, doubtless, of a former condition of society, and it has lingered here, probably, owing to the fact that an unusually large part of our criminal population are colored." While it is true the court did not have

under consideration the question of whether whipping a convict was within the constitutional inhibition against cruel and unusual punishment, its observations are quite applicable to that question.

The Congress of the United States, believing no doubt that whipping was a cruel punishment, has many times expressed its condemnation of it. As far back as 1839 it declared that "The punishment of whipping * * * shall not be inflicted." In 1850 it declared that "flogging in the navy and on board vessels of commerce be and the same is hereby abolished from and after the passage of this Act." In 1861 it declared that "no person in the military service shall be punished by flogging * * *." In 1873, in the chapter on Military Prisoners, 9 U. S. Rev. Stat., 242-243, it declared that "in no case shall any prisoner be subjected to whipping * * *." Later it specifically declared that "in no case shall the punishment of flogging * * * be inflicted upon any person in the navy." These statutes have been in force throughout all the years and are a clear indication of the view taken of whipping by many of the great minds of this country. Finally, on June 4, 1920, in legislating further upon the subject of punishment in the army, the Congress expressed its very definite opinion that whipping was a cruel and unusual punishment by the enactment of the following statute: "Cruel and unusual punishments of every kind, including flogging, branding, marking, or tattooing on the body, are prohibited." Punishment by whipping was thus *specifically characterized* as cruel and unusual.

It is true that the condemnation of whipping expressed in the foregoing statutes did not emanate from the courts but it nevertheless represents the composite opinion of a coordinate branch of the government composed of men from all sections of the country, many of them lawyers of great eminence and I find this opinion more convincing

than the judicial utterances of Maryland, New Mexico, North Carolina and Virginia, which were delivered many years ago under the influence of legislative enactments.

Even if I held an opinion different from that expressed in the federal statutes I would not feel justified in opposing my belief to this tremendous tide of protest which has swept over the land with gathering force for nearly a hundred years, destroying in its course those forms of punishment which contain no element of reformation but which only serve to humiliate and degrade their recipients. This sentiment was engendered no doubt by the historic records of the whipping post in England during the bloody reign of the Tudors, the flogging of Quakers, including delicate and refined women, with a cat-o'-nine-tails, in Colonial America, the knout in Russia and the bastinado in other parts of the world. The revulsion among a free and intelligent people against this form of punishment is not to be wondered at. It is but an indication of the evolution of social concepts and the beneficent influence of a civilization that has its roots in the teachings of the Man of Galilee.

There was a time when the dignity and sacredness of the human body were so little regarded, even among people who thought themselves leaders of civilization, that it was by law placed at the mercy of those who deemed it salutary or expedient to inflict upon it the most brutal and excruciating punishment. It was laid upon the rack and tortured until it recanted its sacred beliefs or became insensible. It was ravished and ruined by lecherous tyrants. It was taken from those whom it loved and sold into bondage to an alien race in a foreign country. It was lashed with bull whips by slave drivers until it was covered with blood. It was beaten and bruised by arrogant naval and military authorities. It was starved and forgotten in infested prisons. It was placed in stocks and

pillories and jeered at and insulted by vulgar mobs. It was guillotined for a look that was construed into treason. It was hanged for killing a hare. It was manacled and chained and driven to penal labor through public streets and highways. Every conceivable indignity was heaped upon it until it was completely bereft of its self-respect. It is the hall mark of our progress that no matter how lowly and friendless a human body may be it has now been lifted from its degredation and shame and placed within the protection of our great Constitution.

Even animals are now under the aegis of our laws. In the chapter on "Cruelty to Animals" it is provided, in section 710, R. L. 1925, that "if any person shall  *  *  * cruelly beat  *  *  * any living creature, he shall be guilty of a misdemeanor." If the whipping with a cat-o'-nine-tails, to which Lucas Candido will now be subjected, should be inflicted on a tethered horse or a leashed dog there is no doubt in my mind that it would be an act of cruelty within the meaning of the statute and punishable as such. Is it less cruel to torment an imprisoned man than it is to similarly torment a dog or a horse? It is no answer to say that under some circumstances it may have a salutary effect to punish a man with a cat-o'-nine-tails but that it can have no such effect if a dog or a horse is likewise punished. So far as I know punishment of a man that is cruel and unusual has never been upheld on the ground that its effect upon him or upon society might be beneficial. Such an end, however desirable it may be to attain it, is no justification for the employment of such means.

For the foregoing reasons I most respectfully dissent from the majority opinion.