STATE OF DELAWARE v. FRANKLIN W. CANNON, JR.

(*April* 3, 1963.)

SOUTHERLAND, C. J., and WOLCOTT and TERRY, J. J., sitting.

*E. Norman Veasey*, Chief Deputy Attorney-General, and *John B. Maybee* and *Peter Warren Green*, Deputy Attorneys-General, for the State.

*Harold Schmittinger, James B. Messick* and *Nicholas H. Rodriguez* for defendant.

*Howard M. Handelman*, Attorney for American Civil Liberties Union, *Amicus Curiae*.

Supreme Court of the State of Delaware, No. 11, 1963.

WOLCOTT, J.:

By order dated February 4, 1963, we accepted certification of the following question:

I. Are any of the statutes (11 *Delaware Code*, §§ 631, 3905, 3906, 3907 and 3908) relating to the imposition of lashes as a form of punishment, unconstitutional on the face of said statutes in that:

(a) They are violative of the protection against "cruel punishments" of Article 1, Section 11 of the Delaware Constitution?

(b) They are violative of the protection against "cruel and unusual punishments" of the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States?

We accepted the certification solely because of apparent widespread public interest in the question of the whipping post arising from the reimposition of a prior sentence carrying the penalty of lashes. Our reasons for doing so more fully appear in our opinion filed in connection with the acceptance. See 5 Storey 585, 189 A. 2d 90.

We refused to accept certification of two further questions on the ground that the framed questions involved matters of penal policy. The procedure on certification does not permit presentation of other than questions of law.

The question accepted for decision raises solely a question of law, *viz.*, the constitutionality of statutes providing for the imposition of lashes as the penalty for the commission of a crime. In giving our answer we do not have to consider the facts of the criminal prosecution which gave rise to the

question of constitutional law; we are not required to determine whether the sentence actually imposed is excessive or disproportionate; nor are we called upon to decide the desirability or undesirability of whipping as a punishment for crime. These are beyond the scope of the purely legal question we have for decision.

Therefore, our answer to the question before us may not be taken in any sense as an expression of individual opinion of any or all of the members of this Court upon the broad policy question. We, individually and collectively, expressly disclaim any expression of opinion either for or against the retention of the penalty of whipping as punishment for crime.

We turn now to a consideration of the legal question. It is one of constitutional law. It is argued that whipping is a cruel punishment prohibited by Article 1, Section 11 of the Constitution of 1897 which reads as follows:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; and in the construction of jails a proper regard shall be had to the health of prisoners."

The origin of this particular provision of our Constitution is Section 16 of the Declaration of Rights of 1776, adopted in the Convention which formed the Delaware State in that year following separation from Great Britain. That section provided "that excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted."

Article 30 of the Constitution of 1776, adopted by the same Convention, proclaimed the Declaration of Rights in all its provisions to be inviolate. In 1792 a new Constitution for the State of Delaware was adopted which, in Article 1, Section 11, continued the prohibition against cruel punishments, omitting the phrase "or unusual", and adopted the language quoted above, now appearing as Article 1, Section

11 of the present Constitution. This same provision appears in the Constitution of 1831 in Article 1, Section 11 of that document.

Therefore, since the independence of the State of Delaware, there has been in its basic law a prohibition against the infliction of cruel punishment for crime. This prohibition has existed in substantially the same form since 1776, for we think the omission of the phrase "or unusual" has little or no significance.

Whipping as a penalty for crime in Delaware goes far back in its history. The first recorded instance was in 1656 under the Dutch. 1 *Scharf, Hist. of Delaware* 604. Thenceforward, the imposition of lashes as a punishment for crime was of common occurrence under the rule of the English. *Records of the Court of New Castle.*

In 1719, by act of Assembly, the imposition of lashes as punishment for crime was authorized. 1 *Laws*, Ch. XXII a. From that time until the present, the statutes of Delaware have provided for the imposition of lashes as a penalty for crime, changing over the years with respect to the number and type of crimes for which the penalty could be imposed, and the total number of lashes which could be imposed.

As the result of a number of different acts of Assembly, the penalty of whipping is now confined to a limited number of crimes, 11 *Del. C.*, §§ 631, 3905-3908, and the Court is now authorized in its discretion to omit under some circumstances from any statutorily-imposed penalty the imposition of lashes, whether or not the particular statute in terms makes the imposition of lashes mandatory. 47 *Laws*, Ch. 144.

Counsel concede that in 1776, when the constitutional prohibition against cruel punishments was placed in our basic law for the first time, whipping was not considered a cruel punishment. It is argued, however, that what was considered not cruel in 1776, in the light of present day society and

knowledge is considered cruel. The argument is therefore that the constitutional prohibition against cruel punishment has changed in meaning with the result that what today is cruel is prohibited, even though 100 or so years ago that precise thing would not have been considered cruel.

It is, we think, generally accepted that constitutional law to some extent may be likened to a progressive science. *Holden v. Hardy*, 169 U. S. 366, 18 S. Ct. 383. This means that when the construction of the provisions and safeguards of a Constitution is required, the words employed are not necessarily static in meaning, but grow and change as the conditions of modern society and knowledge grow and change with the passage of years. This does not mean, however, that the historical context within which a particular constitutional safeguard was first adopted is without importance in ascertaining the present day meaning of the particular language. 11 *Am. Jur.*, Constitutional Law, § 63.

We thus turn to 1776 to determine precisely what cruel punishments the framers of our first Constitution intended to prohibit. It seems to be generally accepted that such provisions in early Constitutions, particularly in those of the original Thirteen States, were intended to prohibit the punishments prohibited in England by 1 *Wm. and Mary*, Ch. 2, the so-called Bill of Rights of England. 3 *Storey on Constitution*, § 1896; *In re Kemmler*, 136 U. S. 436, 10 S. Ct. 930. These were the cruel and barbarous punishments on occasion formerly imposed in England by the Crown. They were punishments considered at the time to be unnecessarily cruel and bordering upon outright torture such as breaking on the wheel, public dissection and the like. IV *Blackstone's Commentaries* 376; *Wilkerson v. Utah*, 99 U. S. 130, 25 L. Ed. 345.

That such was the fact in Delaware in 1776 becomes clear when we consider the punishments for crime then upon the statute books and imposed in the courts of Delaware, both

before and after 1776. The colonial punishments remained in effect in the new Delaware State by reason of Articles 24 and 25 of the Constitution of 1776 which in effect provided that all acts of Assembly in force in Delaware, and all of the Common Law of England theretofore adopted in practice in Delaware, should remain in full force and effect until altered by future act of the General Assembly.

These penalties today constitute a list of horrors. For example, the following penalties, among others, were provided for: death by hanging, drawing and quartering for the crime of treason (1 *Laws* 65); death by burning for the crime of petit treason (1 *Laws* 226); death by hanging for murder and most felonies (1 *Laws* 226); standing in the pillory, cropping of ears, branding, wearing a convict's badge, and selling into servitude. See, *e.g.*, 1 Laws 296. These were provided by statute for a variety of crimes, the cataloging of which would add nothing.

It seems quite clear that the statutes providing for the imposition of the more barbarous forms of these punishments did not remain in the law purely by oversight of the Constitutional Convention of 1776. For some of them were imposed following that year. For example, at the October Term of the Court of Oyer and Terminer in Sussex County in 1780, Chief Justice Killen sentenced eight prisoners convicted of high treason to be hanged, drawn and quartered. Whether the sentences were actually carried out is doubtful because the convicted prisoners later petitioned the Assembly for clemency. But the sentences were imposed. 3 *Del. Archives*, 1302-1304. Previously, in 1731, one Catherine Bevan had been burned to death upon conviction of the crime of petit treason—that is, murdering her husband (*Penna. Gazette*, Sept. 23, 1731)— but, by an act of June 5, 1787, (2 *Laws* 905), this penalty was changed to death by hanging in time to save Sarah Kirk convicted of a like crime from being executed by burning. *Penna. Packet*, Oct. 13, 1787.

The preamble of this act throws light upon the attitude of the times toward cruel punishments. It is recited that in the judgment of the General Assembly of 1787 the punishment for petit treason, *i.e.*, death by burning, is "too severe, and contrary to the mild spirit of the constitution and laws" of the State. It would seem that the meaning of the phrase "mild spirit" differed in 1787 from its meaning today, since the penalty of hanging, drawing and quartering for high treason does not seem to have been changed until the passage of a general codification of the criminal laws providing for punishment of crimes and misdemeanors enacted February 8, 1826, 1829 *Code* 143, by which act it was provided that all punishments by death shall be inflicted by hanging. The 1829 *Code* continued to provide for imprisonment, fining, standing in the pillory, cropping of ears, selling into servitude, branding and whipping as punishments for crime, each crime, of course, being punished by any or several of the listed forms of punishment.

Thereafter, with the passage of years, the General Assembly modified the laws imposing punishment for crime. Thus, the wearing of the convict's badge was abolished, branding was abolished, cropping of ears was abolished, the whipping of women was abolished, but it was not until 1905, after the adoption of the Constitution of 1897, that the punishment of the pillory was abolished. 23 *Laws*, Ch. 213.

The historical development of the laws of this State, therefore, indicates a gradual change in the viewpoint and beliefs of the General Assembly as to what constitutes proper punishment for crime. Indeed, the state of our present law is such that punishments for crime are now limited to death by hanging, imprisonment and fining, and in addition, in some few instances, the imposition of lashes, the sole holdover today of the infliction of corporal punishment for crime.

 It is argued to us that we at this time should rec-

ognize the modern view condemning corporal punishment for crime and declare that the infliction of lashes as punishment is the remnant of a cruel age, and should be declared to be a violation of the constitutional prohibition against cruel punishments. We think, however, this is not our function. We accept unquestionably that Constitutions are living documents in the sense that the phraseology used in them grows and changes with the passage of time. *Weems v. U. S.*, 217 U. S. 349, 30 St. St. 544. The meanings of words change and grow with the changing sensibilities, beliefs and knowledge of man. We think, however, that this change, this growth, this enlightened meaning of words used in Constitutions, comes about by reason of the beliefs of the people themselves. The change may not come solely by reason of the individual belief of an individual judge. What better way is there for the people to express an enlightened attitude toward the punishment of crime than through their elected representatives, the members of the General Assembly who, indeed, hold their office for the very purpose of expressing the will and beliefs of the people who elected them.

Furthermore, the history of the criminal laws of Delaware demonstrates that this is an effective force to bring about change. If the people feel strongly enough upon a subject, their elected representatives respond to their will. We have no doubt but that the gradual elimination from our criminal law of many punishments now considered cruel was accomplished by the General Assembly pursuant to the will of the people.

Once a particular form of punishment is abolished, thus evidencing a belief that it is cruel, it thereafter is prohibited by the subsequent adoption of the prohibition against the imposition of cruel punishments. 1 *Cooley's Constitutional Limitations* (8th Ed.) 694. Thus it is that Article 1, Section 11 of the Constitution of 1831 prohibited absolutely the reinstatement of the penalties of hanging, drawing and quarter-

ing for treason, and death by burning for petit treason. This follows from their repeal in 1787 and 1826, which we take to be an expression by the people through their elected representatives that such punishments were cruel.

Today, however, there has been no legal and effective expression of the people speaking through the General Assembly that whipping is a cruel punishment in the constitutional sense. Indeed, we think we may judicially notice the fact that there is undoubtedly a decided difference in view on the part of the people. What the weight of public opinion pro or con is, we have no way of knowing. Certain it is, however, that as yet the only constitutionally sound way of expressing the public sentiment, by act of Assembly, has not condemned the imposition of lashes as a cruel punishment.

It is the province of the General Assembly in its wisdom to give expression to the public will. It may either by inaction permit the practice to continue or, by action, condemn it as a cruel punishment. Judicial restraint and a proper recognition of the function of the Legislative and Judicial branches of government compel us to express no opinion upon the propriety of doing either.

It is, however, urged that the Eighth Amendment to the Constitution of the United States prohibiting imposition of cruel and unusual punishment is binding upon this State and, consequently, that we must declare the punishment of whipping unconstitutional under the Eighth Amendment even though it may not be prohibited by the Delaware Constitution. To be sure, the Supreme Court of the United States has held that the Eighth Amendment, by reason of the Fourteenth Amendment, is binding upon the several States of the Union, *Robinson v. California*, 370 U. S. 660, 82 S. Ct. 1417, and that whether or not a punishment is cruel and unusual is to be interpreted by the standards of present day society.

This holding of the Supreme Court of the United States is, of course, binding upon us. The Supreme Court, however, has not as yet held the punishment of whipping, in itself, cruel. It has spoken of it as infamous, but that is possibly true of all punishment for crime.

"The Eighth Amendment expresses the revulsion of civilized man against barbarous acts—the 'cry of horror' against man's inhumanity to his fellow man." Per Mr. Justice Douglas, concurring in the *Robinson* case. We note that in Great Britain the punishment of whipping was in use until 1948, and in Canada until 1957. Its discontinuance was accomplished by legislative act, not by judicial fiat. It does not seem to us that a punishment so recently in use in the country that leads the world in the administration of justice may be held to be a barbarity that, as a matter of constitutional law, must be deemed cruel and unusual.

Furthermore, it certainly is not without significance that the abolition of whipping as a punishment for crime in those States of the Union which in the past provided for it, has uniformly been accomplished by legislative action. Counsel have not cited to us any case, nor has our own search brought one to hand, in which a court as a matter of constitutional law held the punishment to be cruel and unusual and thus prohibited. We may assume, therefore, that in those States the matter was considered one for the legislative expression of the will of the people. We think the standards of present day society are to be determined by the expressions of that society, itself, and not by an expression of the individual opinions of members of the Judiciary. This standard must be a collective one and it can be determined only by an expression of views from the people which make up that society. The only manner in which such an expression can be made is through the action of duly elected representatives of the Society whose standard is to be applied.

Accordingly, we are of the opinion that the Eighth and Fourteenth Amendments to the Federal Constitution do not invalidate the statutes of the State of Delaware imposing the punishment of whipping for certain crimes.

By reason of all of the foregoing, the answer to the question certified is in the negative.