**Clifford Dean SEENEY, Appellant,**

v.

**The STATE of Delaware, Appellee.**

Supreme Court of Delaware.

April 20, 1971.

Rehearing Denied May 11, 1971.

Harrison F. Turner, Asst. Public Defender, and G. Francis Autman, Jr., Dover, for appellant.

Jerome O. Herlihy, Chief Deputy Atty. Gen., and Richard R. Wier, Jr., State Prosecutor, Wilmington, for the State.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice:

This is an appeal from a conviction of murder in the first degree without a recommendation of mercy, and a resulting sentence of death. The facts of the matter are stated briefly.

On May 16, 1969, Clifford D. Seeney, who apparently was engaged to Mary Jane Thomas by whom he had had a child, arrived at a location where there were two house trailers, one of which was occupied by Mary Jane Thomas and her mother, and the second by Mrs. Donald Thornley, sister of Mary Jane, and her family. Seeney blew his horn and Mrs. Thornley went out to his car from her trailer. She testified Seeney seemed to be upset or crying, and that he asked to see his child.

Mrs. Thornley stated that the baby was ill and that she and her sister were planning to take the child to the doctor. She told Seeney to wait and walked over to the trailer in which Mary Jane Thomas lived, and called her. Seeney closely followed Mrs. Thornley to the other trailer, unknown to Mrs. Thornley. As soon as Mary Jane Thomas came to the door, Seeney reached over or around Mrs. Thornley and pulled Mary Jane out of the trailer. There was apparently a slight scuffle and Mrs. Thornley and Mary Jane Thomas were pushed or thrown to the ground. At this time Mrs. Thornley saw a gun in Seeney's hand. Her testimony was that he had the gun openly in his hand as he reached into the trailer to pull Mary Jane Thomas out.

Mrs. Thornley shouted to Seeney to stop, to which Seeney replied, telling her to shut up or he would shoot her, too. Seeney then moved to a position at Mary Jane Thomas' feet, fired one shot into the ground and then shot her five times. Of the five bullets which entered her body, at least two, and probably a third, were fatal wounds. The weapon used in the killing was a .45 caliber automatic pistol. There

is nothing in the record to establish any motive or reason why Seeney shot his presumable fiancee and mother of his child.

Seeney did not take the stand in his own defense, nor was a defense based on mental illness offered in his behalf.

■■ The above is a fair summary of the State's case on which the jury returned a verdict of guilty of murder in the first degree. Seeney argues that the State's case is insufficient to establish a case of murder in the first degree and is, at the most, murder in the second degree.

The crime of murder in the first degree is defined in 11 Del.C. § 571 as follows:

"Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason, is guilty of murder in the first degree and of a felony, and shall suffer death."

This court, in Bantum v. State, 7 Terry 487, 85 A.2d 741, had occasion to review the law of murder in the first degree. It was pointed out that a homicide is murder if it is committed with malice aforethought. This is a necessary ingredient of either first or second degree murder under our statutes.* Malice may be either express or implied in law. If it is the latter, then the killing is one of murder in the second degree. Express malice is when a *killing is committed with a sedate, deliberate mind and formed design.*

Since 11 Del.C. § 571 provides that murder in the first degree is murder committed with express malice aforethought, it was further held that the State must prove, in addition to malice, that the defendant had a formed design or intention to kill, or to do great bodily harm, and that at the time of the killing he had a sedate and deliberate mind, of which the intention to kill or do great bodily harm was the product. Each

---

* Murder in the second degree is defined by 11 Del.C. § 572 as the commission of murder, other than murder in the first degree.

of the latter two elements of the crime must be proved by external circumstances other than the mere fact of the killing.

■ Of course, the use of a deadly weapon proves the existence of malice toward the deceased. Powell v. State, 7 Terry 551, 86 A.2d 371. Seeney argues, however, that there is no circumstance or proof of whatsoever kind to indicate that he, at the time of the killing, had a formed design or intention to kill, or that he had a sedate and deliberate mind which produced a formed design to kill the deceased. He argues that the State has not proved that he came to the scene intending to kill Mary Jane Thomas. In effect, he argues that the killing was the result of a momentary impulse arrived at at the time the deceased's sister left his car and walked toward the trailer.

We think, however, to the contrary. The State's case is sufficient to present an issue for the determination of the jury as to whether or not the state of mind of Seeney was such as to permit a finding that he arrived at the trailer site with the intention of killing the deceased, or whether or not he suddenly, on impulse, formed the intention to kill the deceased. This is an issue to be determined solely by the jury when there are any facts in the record justifying one inference or the other. Bantum v. State, supra.

The following circumstances, it seems to us, would have justified the jury in determining that Seeney arrived at the scene with the formed design to kill the deceased, arrived at with a sedate and deliberate mind. First, the testimony of Mrs. Thornley to the effect that Seeney, when she first saw him, was upset and seemed either to be crying or on the verge of tears, is not incompatible with the conclusion that he drove to the scene with the formed intention of killing his former paramour. It is conceivable that such a formed intent would be an upsetting emotion. The fact that, when Mrs. Thornley left his car and proceeded toward the trail-

er in which the deceased was living, he followed immediately with a gun carried openly in his hand, at least by the time he reached the trailer, and his immediate reaction to the appearance of the deceased by pulling her out of the trailer and throwing her to the ground and pumping five bullets into her body, it seems to us justifies the jury's obvious conclusion that he had come to the scene with the express formed design to kill her, and took the first opportunity of carrying out that design. Also of significance is the fact that there is nothing in the record which can be remotely considered as an exciting occurrence to put him under any stress.

■ Seeney argues earnestly that the State failed to prove a lapse of an appreciable period of time in which he could have formed a sedate and deliberate mind to kill. However, the design to kill is proven by the use of a deadly weapon, and the actual killing. Bantum v. State, supra. It is true that the State's case does not pinpoint the precise time he formed the intent to kill the deceased, nor did the State prove the passage of any particular amount of time during which Seeney was acting with a sedate and deliberate mind. However, no particular lapse of time is required to form a sedate and deliberate mind. The rapidity of mental reaction is not susceptible of measurement, and the existence of a sedate and deliberate mind, a necessary element to first degree murder, is peculiarly within the province of the jury to determine under all the circumstances. It can happen on the spur of the second. Bantum v. State, supra; Longoria v. State, 3 Storey 311, 168 A.2d 695; Bennett v. State, 3 Storey 36, 164 A.2d 442 (Del.Supr., 1960).

Seeney relies upon Jenkins v. State, 230 A.2d 262 (Del.Supr., 1967). The case, however, is not in point. In the *Jenkins* case there was no evidence whatsoever as to the use of a deadly weapon, and the only evidence to connect Jenkins to the death of the victim was that, while committing a felony, i. e., larceny in a junkyard, Jenkins was surprised and entered

into a fight with an individual, presumably the deceased, which resulted in his death. There was no use of a deadly weapon, nor was any weapon ever found, and there was no evidence whatsoever of Jenkins having carried a deadly weapon to the scene where the killing took place. In our opinion, the case has nothing to do with the case at bar.

We conclude, therefore, that the State's case was sufficient for the submission of the issue of first or second degree murder to the jury, and the jury having ruled upon this issue, its finding will not be disturbed.

■ Secondly, Seeney argues that the denial of a bifurcated trial on the issues of guilt and mitigation is a violation of his constitutional rights under the Fifth and Fourteenth Amendments of the United States Constitution. In point of fact, the same jury determined the issue of guilt and the degree, and whether or not a recommendation of mercy should be made to the sentencing judge. Seeney argues in his brief that the submission of these two issues to the same jury was a violation of his constitutional rights.

At the time Seeney's brief was written in this appeal, our decisions in Parson v. State, 1970, 275 A.2d 777, February 16, 1971, and Steigler v. State, 1970, 277 A.2d 662, February 16, 1971, had not been handed down. These two cases rule adversely to Seeney upon this question, and we refuse to reconsider it. In his reply brief, Seeney, while not relinquishing the point, nevertheless does not pursue it in this appeal in view of those two prior decisions.

■ Finally, Seeney argues that the statute restoring capital punishment in this State, after its abolition, was unconstitutionally enacted, and that, therefore, there is no provision in the law of Delaware for the imposition of the death penalty.

Some factual background is required in order to understand the argument. On April 2, 1958, by the enactment of 51

Laws, Ch. 347, 11 Del.C. § 571 was amended to eliminate the prior authorization for the imposition of a death sentence, and substituted in lieu thereof imprisonment for life. In 1961, Senate Bill 192, with House Amendment No. 1, was enacted by both houses of the General Assembly. The Governor vetoed this bill and returned it to the Senate, the House of its origin, with his reasons for the veto. Both the Senate and the House thereafter passed the bill restoring the death penalty to Delaware law over the veto of the Governor. Seeney contends that in doing so, the House failed to comply with the constitutional requirements of Article III, § 18, Del.C.Ann.

Article III, § 18 provides that every bill which has passed both Houses of the General Assembly shall be submitted to the Governor who, if he approves it, shall sign it, but if he shall not approve it, then he shall return it with his objections to the House in which it originated, which shall thereupon enter the Governor's objections at large on its Journal, and proceed to reconsider it. If, after reconsideration, three-fifths of all the members elected to that House agree to pass the bill, it shall then be sent to the other House which, if it approves by three-fifths vote of all members elected, the bill shall then become the law over the Governor's objections. Section 18 further provides in part:

"But in neither House shall the vote be taken on the day on which the bill shall be returned to it."

Senate Bill 192 was returned to the Senate on Thursday, December 14, 1961, and all of the constitutional requirements were complied with; that is, the Governor's objections were entered at large on the Senate Journal, and the following day, Friday, December 15, 1961, the Senate reconsidered the bill and passed it with the required constitutional majority of three-fifths of all the members elected to that House. The bill was then sent to the House of Representatives for its action. Upon receipt by the House, the Governor's

objections to the bill were not entered at large upon the House Journal. Upon the same day of its receipt, the House thereupon proceeded to reconsider, and passed the bill over the Governor's veto by the required constitutional three-fifths majority of all the members of the House.

Seeney does not complain that the Senate, the originating House of the General Assembly, did not properly comply with the requirements of Article III, § 18 of the Constitution. He does, however, complain that the House of Representatives failed to comply in that it did not spread the Governor's veto message at large upon its Journal and, in fact, acted upon the bill on the same day on which it received it from the Senate, in contravention of Article III, § 18. However, none of this appears from the bill, itself, nor from the official cover of the actual bill sent to the Governor for recording as a law of the State. The cover, a certified copy of which has been furnished us, on its face shows no infirmity in the passage of the law originally, or in the passage of the law over the Governor's veto. It shows action by the Senate on December 15, 1961, and action by the House on December 18, 1961, both of which were taken as a result of the constitutionally required majority.

This State is committed to the Enrolled Bill Doctrine which means that a court in considering the valid enactment of a law may not go back of the enrolled bill, itself, and examine the Journals of the Senate and House of the General Assembly in order to test the regularity of the enactment of the law. State ex rel. Craven v. Schorr, 11 Terry 365, 131 A.2d 158 (Del. Supr.1957); Opinion of the Justices, 232 A.2d 103 (Del.Supr.1967); Ingersoll v. Rollins Broadcasting Co., Inc., 269 A.2d 217 (Del.Supr.1970).

As we said in *Opinion of the Justices,* supra, the effect of the Enrolled Bill Doctrine "is to prevent a court, in the consideration of the constitutionality of the en-

actment of any piece of legislation, from going back of the enrolled bill and considering any matter which took place in the General Assembly prior to the final passage of the bill."

The result is, therefore, that we, in considering the constitutional enactment of legislation, may not inquire into the Journals of the Senate and House in order to determine the manner and the propriety of the enactment, itself. Once the bill is enrolled, that is the end of the matter, except, as we pointed out in the *Ingersoll* case, in the presence of fraud. Of course, upon a showing of fraud, then the whole matter is open to examination and the Journals and what actually took place in the two Houses of the General Assembly may be considered by the court. In this case, however, there is no charge or any showing whatsoever of fraud. We are consequently bound by the bill as it has been enrolled.

As a matter of fact, it is extremely doubtful that the construction Seeney places upon Article III, § 18 is the proper one. He argues that the requirement that the returned bill with the Governor's veto not be acted upon on the same day on which it is received by the originating House applies to both Houses of the General Assembly. We think, however, it is probable that such is not so. We refer to In re Session Laws, 98 N.J.L. 586, 121 A. 736 (1923). In that case the Supreme Court of New Jersey was called upon to construe the then provision of the New Jersey Constitution, almost identical to the present Article III, § 18 of the Delaware Constitution. The facts before the Supreme Court of New Jersey were almost identical to those Seeney urges upon us in this appeal. The New Jersey Supreme Court construed the applicable constitutional provision as prohibiting action upon the same day on which the bill was returned solely to the originating House, but the provision had no application to the receipt by the second House from the originating

House of the bill for its concurrence or disapproval.

Under the circumstances, therefore, we think it highly likely that even if the Enrolled Bill Doctrine were not the law of this State, the argument of Seeney in this respect would not prevail.

The conviction below is affirmed.