STATE of Delaware, Plaintiff,

v.

Randolph DICKERSON, Defendant.

Supreme Court of Delaware.

Nov. 1, 1972.

Rehearing Denied Nov. 21, 1972.

Supplemental Opinion Jan. 22, 1973.

**762**

Richard R. Wier, Jr., State Prosecutor, and Mason E. Turner, Jr., Deputy Atty. Gen., Wilmington, for plaintiff.

Richard Allen Paul and Arlen B. Mekler, Asst. Public Defenders, Wilmington, for defendant.

Louis L. Redding, Wilmington, for Delaware State Conference of Branches of the National Association for the Advancement of Colored People, amicus curiae.

Before WOLCOTT, C. J., and CAREY and HERRMANN, JJ.

HERRMANN, Justice (for the Majority of the Court):

This certification presents the question of the constitutionality of capital punishment under our First Degree Murder Statute (11 Del.C. § 571) [1] and our Recommendation of Mercy Statute (11 Del.C. § 3901), [2] in the light of the recent decision of the United States Supreme Court in

Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), dealing with capital punishment as "cruel and unusual" punishment under the Eighth and Fourteenth Amendments.

I.

The defendant is awaiting trial on the charge of murder in the first degree in violation of 11 Del.C. § 571.

Stating that an early determination thereof by his Court is necessary as guidance in the proper trial of this case and other first degree murder cases now pending, the Superior Court has sought and obtained certification of the following questions of law:

1. Are the discretionary mercy provisions of 11 Del.C. § 3901 unconstitutional under Furman v. Georgia?

2. If the answer to Question 1 is yes, is the mandatory death penalty prescribed in 11 Del.C. § 571 constitutional?

II.

The threshold problem is an accurate understanding of the precise holding of the *Furman* case which has become the law of the land binding upon this Court. This presents some difficulty, in view of the fact that each of the nine justices wrote a separate opinion setting forth a different rationale, while a tenth *per curiam* opinion represents the decision of the Court in its 5–4 division. Dissenting members of the Court, themselves, expressed doubt as to the precise scope and meaning of the majority decision in *Furman*.[3]

---

1. 11 Del.C. § 571 provides:
   "§ 571. Murder in the first degree
   "Whoever commits the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate the crime of rape, kidnapping or treason, is guilty of murder in the first degree and of a felony, and shall suffer death."

2. 11 Del.C. § 3901 provides:
   "§ 3901. Recommendation of mercy
   "In all cases where the penalty for crimes prescribed by the laws of this State

is death, if the jury, at the time of rendering their verdict, recommends the defendant to the mercy of the Court, the Court may, if it seems proper to do so, impose the sentence of life imprisonment instead of death."

3. In the dissent of Chief Justice Burger, doubt as to the precise holding of the majority was expressed as follows: (92 S.Ct. at 2807)

It is easier at the outset to state what *Furman* did not decide: The United States Supreme Court has not ruled in *Furman* that capital punishment, *per se*, is violative of the Eighth and Fourteenth Amendments [4] ban on cruel and unusual punishment; nor has it ruled that the death penalty is barred for any particular class or classes of crimes. Only 2 of the 5 concurring justices, Justices Brennan and Marshall, concluded that the Eighth Amendment prohibits capital punishment for all crimes and under all circumstances; the third concurring member of the Court, Justice Douglas, refrained from reaching that ultimate question, deciding the cases on an equal protection of the laws basis; and the other 2 members of the majority, Justices Stewart and White, did not reach the ultimate question because they concluded that the death sentences before the Court must be set aside on the ground that the sentencing practices followed violated the Eighth Amendment.[5]

The sum and substance of the decision that ultimately earned the support of a majority of the Court in *Furman* was expressed in the *per curiam* opinion as follows: (92 S.Ct. at 2727)

"The Court holds that the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and the cases are remanded for further proceedings."

Otherwise stated, the decision of the United States Supreme Court in *Furman* was limited to the holding that the death sentences, as imposed in the cases then before it, constituted "cruel and unusual" punishment within the ban of the Eighth Amendment.

For the clearest understanding of the limited decision of the United States Supreme Court in *Furman*, we must look to the concurring opinions of Justices Douglas, Stewart, and White:

Mr. Justice Douglas based his decision (92 S.Ct. at 2727) on the belief that capital punishment statutes, which leave the decision of life or death in the uncontrolled discretion of judge or jury, are being applied in a way that discriminates against minorities and the poor; and that such "discrimination is * * * not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments."

Mr. Justice Stewart pointed out (92 S. Ct. at 2760) that the constitutionality of capital punishment in the abstract was not before the Court in *Furman*. He stated that death sentences which are left to the uncontrolled discretion of judge or jury are being applied on such random and capricious basis that the imposition thereof has become cruel and unusual; that the states do not apply capital punishment uniformly or automatically; that few defendants actually incur the death penalty; that those who do "are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed."

"The actual scope of the Court's ruling, which I take to be embodied in these concurring opinions, is not entirely clear." See also dissent of Mr. Justice Powell, 92 S.Ct. at 2817.

4. The Eighth Amendment to the Federal Constitution provides:
"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."
While the Fourteenth Amendment is, of course, operative throughout in the application of the Eighth Amendment prohibi-

tion to the State, Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ; Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), reference will be made herein to the Eighth Amendment only for the sake of brevity.

5. In *Furman* and each of the two related cases, the death sentence was imposed. In each, the determination of whether the penalty should be death or a lesser penalty was left by state statute and procedure to the discretion of the jury.

Further: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." Concluding: " * * * the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."

Mr. Justice White wrote (92 S.Ct. at 2763) that, although he does not decide that the death penalty is unconstitutional *per se*, he does believe that the death penalty is now so infrequently imposed that it no longer satisfies "any existing general need for retribution" or has any deterrent value; that "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not"; that, therefore, the Eighth and Fourteenth Amendments were violated by the death sentences imposed.

Manifestly, therefore, the effect of *Furman* is to invalidate the uncontrolled discretionary imposition of the death penalty by jury or judge. The *Furman* decision goes that far, but no farther.

### III.

█ As thus analyzed, the fatal effect of the *Furman* decision upon our Recommendation of Mercy Statute (hereinafter "Mercy Statute") is clear. That Statute delegates to jury and judge uncontrolled discretion in the imposition of the death penalty. Under the Mercy Statute, there is room for that caprice, whim, and discrimination in the imposition of the death

penalty that now stands condemned by the United States Supreme Court in *Furman*.

The fatal effect of the *Furman* decision upon the Mercy Statute is conclusively demonstrated by the mandates, arising out of *Furman*, received by this Court from the United States Supreme Court in certain first degree murder cases which had been tried under the combined Murder Statute and Mercy Statute, in which convictions were had and death sentences imposed, and appeals then taken to the United States Supreme Court. In each of those Delaware cases, the United States Supreme Court implemented *Furman* by vacating the judgment of conviction "insofar as it leaves undisturbed the death penalty imposed" and by remanding each cause to this Court for "further proceedings".

It follows that the Mercy Statute must fall under the *Furman* decision as being violative of the Eighth Amendment. All parties concur in that conclusion.

### IV.

The question then arises as to whether our First Degree Murder Statute (hereinafter "Murder Statute"), and the mandatory death penalty contained therein, stands alone or whether it falls with the Mercy Statute under the *Furman* decision.

█ It is argued that the penalty provision of the Murder Statute may not stand alone because, together with the invalid Mercy Statute, it is a constituent and inherent part of a statutory scheme; that, therefore, the two Statutes are unseverable. In support and in opposition to this contention, both sides rely upon the legislative history of the two Statutes [6] in their ef-

---

6. Capital punishment has been a penalty in Delaware since colonial days; and, until 1911, mandatory death was the penalty for the crimes specified.

Colonial capital offenses were murder, treason, manslaughter by stabbing, serious maiming, highway robbery, burglary, third offense larceny, arson, sodomy, buggery, rape, concealing the death of a bastard child, advising another to kill such child,

and witchcraft, Caldwell Penology in Delaware in Reed, History of the First State, Vol. 2, p. 852; 1 Del.L., p. 297. By the time of the 1829 Delaware Code, capital offenses were limited to seven: murder, stabbing causing death, rape, burglary, arson, second offense kidnapping, and treason. 1829 Del.C., pp. 127–131. The 1852 Code further limited capital crimes to five: murder in the first degree, trea-

forts to demonstrate legislative intent upon the question of severability. Legislative intent, of course, governs the issue of severability if it may be ascertained with reasonable certainty. State v. Ayers, Del. Supr., 260 A.2d 162 (1969). Unfortunately, we have no recitals, minutes, reports, or other indicia of legislative intent to aid in resolving the question. Compare Sincock v. Gately, 262 F.Supp. 739, 745 (D.Del. 1967). We are left to supposition.

The defendant and the *amicus* contend that the trend of capital punishment throughout the nation in 1961 does not permit the conclusion that the Legislature intended to regress by going from the total abolition of the death sentence to the other extreme of the mandatory death sentence which, by then, had disappeared in practically every other State.[7] The State contends that the basic legislative intent in 1961 was clear: to restore the death penalty; that the Mercy Statute was a secondary consideration; and that the passage of the Murder Statute and the Mercy Statute in separate enactments[8] indicated severabili-

son, rape, arson, and burglary. 1852 Del.C., pp. 471–476. The 1915 Delaware Code retained the death penalty for those same offenses. 1915 Del.C., §§ 4697, 4696, 4706, 4721, 4727. The 1935 Delaware Code retained five capital offenses: first degree murder, treason, burglary, kidnapping, and rape. 1935 Del.C., §§ 5157, 5154, 5187, 5174, 5166. The 1953 Delaware Code retained four capital offenses: first degree murder, treason, kidnapping, and rape. 1953 Del.C., §§ 571, 861, 623, 781.

Until 1911, the death penalty was mandatory in all capital offenses. In that year, the General Assembly amended the rape statute by providing a limited discretion permitting the jury to recommend mercy, in which event the court could impose the sentence of life imprisonment. 26 Del.L., Ch. 270. In 1917, the Legislature enacted the predecessor of the present Mercy Statute by providing that in any capital case, if the jury recommended mercy, the court might in its discretion, impose a sentence of life imprisonment instead of death. 29 Del.L., Ch. 266. This provision wase carried into the 1935 Delaware Code as § 5330 and into the 1953 Delaware Code as § 3901 of Title 11.

Capital punishment was abolished in Delaware in 1958. 51 Del.L., Ch. 347. In 1961, capital punishment was restored for the single crime of first degree murder (the Murder Statute involved here) and at about the same time, the pre-existing Mercy Statute (the Mercy Statute involved here) was restored. The Murder Statute became law as 53 Del.L., Ch. 310; it had been S.B. 192. The Mercy Statute became law as 53 Del.L., Ch. 309; it had been S.B. 215.

S.B. 192 was introduced on June 12, 1961 and was passed and sent to the House on June 14. S.B. 215 was introduced on June 22 and, on the same date, was passed and sent to the House. On December 4, 1961, S.B. 215, as amended, passed the House and was returned to the Senate where it passed on December 5; and on December 5, S.B. 192 passed the House. The Governor vetoed both Bills; whereupon, on December 18, both Bills were passed by both Houses over the Governor's veto.

Both the Murder Statute and the Mercy Statute have been carried into the 1973 Delaware Revised Criminal Code (effective April 1973) as § 4209.

7. The *amicus curiae* reports: By 1961, the mandatory death sentence for first degree murder had been abandoned almost universally in the United States after almost a century of change from the mandatory to the discretionary form. By 1961, New York was the only remaining state to retain the mandatory death sentence. All other states, in which capital punishment prevailed, had changed to the discretionary death sentence; and in 1965, New York likewise changed. Nine states have abolished the death penalty and reinstated it in discretionary form; of these, four have undergone periods of abolition after an earlier adoption of discretionary capital sentencing; each reinstated the discretionary form; none reverted to the mandatory form.

8. It is noteworthy that, when *Furman* was decided, three States—Delaware, Florida, and Louisiana—had cases pending before the Supreme Court which arose under Statutes that were "separate" enactments, mechanically and chronologically. See Fla.Stat.Ann. § 919.23 (1944) and § 782.04 (1965); La.Stat.Ann. § 14:30 (1951), § 15–409 (1951) and La.Code Crim.Pro. Art. 817 (1966). On the authority of *Furman*, the Supreme Court vacated the death sentences imposed in the cases which had originated in these three States, thus making no distinction as to the "separate" statute cases among the total of 120 cases, involving 125 condemned persons, from 26 states.

ty in the absence of an express provision to the contrary.

█ We find it unnecessary to engage in such conjecture as to legislative intent regarding severability. The question is governed by 1 Del.C. § 308.[9] It is there provided that if any provision of the Code or the application thereof is held invalid, "such invalidity shall not affect the provisions or application of this Code * * * that can be given effect without the invalid provisions or application, and to this end the provisions of this Code * * * are declared to be severable."

The question then becomes this: may the Murder Statute be "given effect" without the "invalid provisions or application" of the Mercy Statute, and thus be severable under § 308?

The Murder Statute passes the severability test prescribed by § 308: It "can be given effect without the invalid provisions or application" of the Mercy Statute. On its face, the Murder Statute is complete and whole in all respects. It may stand alone and be "given effect" alone. It is not in any way dependent upon the Mercy Statute for viability. We have been shown no deficiencies which would bar its being "given effect" standing alone; and we see none.

As has been stated, the defendant and the *amicus* argue that the Murder Statute, standing alone, may not be "given effect" because that conclusion would mean regression to the mandatory death penalty; and,

they contend, the General Assembly could not have intended such regression. This is a strong argument; but it falls short of demonstrating the "manifest" intent of the General Assembly.

It is the search for a "manifest" legislative intent with which we are confronted in this aspect of this case. By 1 Del.C. § 301,[10] it is provided that the "rules of construction * * * set forth in this chapter [including § 308] shall be observed in the construction of this Code and all other statutes, unless such construction would be inconsistent with the *manifest* intent of the Legislature, * * *." (Emphasis supplied)

By definition, the word "manifest" includes the concept of being "obvious", "apparent", or "beyond doubt or question". While reasonable men may differ as to whether, in 1961, the General Assembly would have enacted the Murder Statute without the Mercy Statute, or would have permitted the first to stand alone without the second if it had to elect, we do not think it can be said that the matter is "beyond doubt or question". All we have to go on, in pursuit of the ethereal legislative intent regarding severability, is the chronological history of the two Statutes and speculation. That is not enough to enable us to ascertain that the severability of the Murder Statute from the Mercy Statute is "inconsistent with the manifest intent of the Legislature" as is required by § 301 in order to override the rule of severability prescribed by § 308.[11]

---

9. 1 Del.C. § 308 provides:
   "§ 308. Severability of provisions
   "If any provision of this Code or amendments hereto, or the application thereof to any person, thing or circumstances is held invalid, such invalidity shall not affect the provisions or application of this Code or such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable."

10. 1 Del.C. § 301 provides:
   "§ 301. Rules of construction and definitions

"The rules of construction and the definitions set forth in this chapter shall be observed in the construction of this Code and all other statutes, unless such construction would be inconsistent with the manifest intent of the Legislature, or repugnant to the Code or to the context of the same statute."

11. Any doubt, as to the correctness of our conclusion on severability, is resolved by the maxims that a statute must be held valid if it is possible for the court to do so; that every presumption must be resolved in favor of its validity; and that

Accordingly, we hold, under 1 Del.C. § 308, that the Murder Statute, including the mandatory death penalty contained therein, is severable from the Mercy Statute; that it does not fall with the Mercy Statute under *Furman*; and that it now stands alone, severed from the Mercy Statute.

## V.

It is contended that the application of the mandatory death penalty of the Murder Statute, standing alone, will be "cruel and unusual" punishment under the Eighth Amendment and "cruel" punishment under the State Bill of Rights.[12]

As has been demonstrated, *Furman* does not hold that mandatory capital punishment *per se*, uniformly applied, is violative of the Eighth Amendment. The express reservations of Justices Stewart and White and the analyses contained in the dissenting opinions make that clear. Accordingly, we are satisfied that the mandatory death penalty of the Murder Statute, if uniformly applied, has not been invalidated by *Furman*.

It is argued, however, that although it may not be specifically covered by the *Furman* decision, the mandatory death sentence nevertheless will constitute cruel and unusual punishment within the federal constitutional ban. We cannot agree.

The United States Supreme Court has consistently acknowledged the constitutionality of capital punishment *per se*, either by assumption or assertion. Wilkerson v. Utah, 99 U.S. 130, 25 L.Ed. 345 (1878); In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); see dissenting opinion of Mr. Justice Powell in *Furman*, 92 S.Ct. at 2819–2823.

And this Court has consistently rejected the contention that capital punishment *per se* constitutes "cruel" or "cruel and unusual" punishment within the constitutional bans. Recently, in Steigler v. State, Del. Supr., 277 A.2d 662, 669 (1971), we stated:

"* * * In our opinion, the matter of the retention or abolition of the death penalty is a question for the lawmaking authorities rather than the Courts.

"As was said in State v. Cannon, Del. Supr., 5 Storey 587, 190 A.2d 514 (1963):

"'It is the province of the General Assembly in its wisdom to give expression to the public will. * * * We think the standards of present day society are to be determined by the expressions of that society, itself, and not by an expression of the individual opinions of members of the Judiciary. * * * The only manner in which such an expression can be made is through the action of duly elected representatives of the Society whose standard is to be applied.'"

See also Parson v. State, Del.Supr., 275 A.2d 777 (1971); Seeney v. State, Del.Supr., 277 A.2d 670 (1971).

■ In the light of our consistent judicial policy, and the long history of capital punishment in this State from colonial times, we reaffirm the view that capital

---

12. Del.Const. Art. 1, § 11, Del.C.Ann., provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted; * * *."
Compare the "cruel or unusual" punishment constitutional provision dealt with in People v. Anderson, 6 Cal.3d 628, 100 Cal.Rptr. 152, 493 P.2d 880 (1972).

it should not be declared unconstitutional unless the court is convinced of that status beyond a reasonable doubt. Coleman v. Rhodes, Del.Super., 5 W.W.Harr. 120, 159 A. 649 (1932). We are not so convinced.

punishment *per se* is not violative of the constitutional guaranties against "cruel" or "cruel and unusual" punishment; and that the retention or abolition of capital punishment in this State is for the decision of the people of this State, speaking through their chosen representatives in the General Assembly.

■ Accordingly, we hold that, uniformly applied, the mandatory death provision of the Murder Statute, standing alone, will not constitute "cruel" or "cruel and unusual" punishment in violation of the constitutional guaranties.

## VI.

But the mandatory death penalty contained in the Murder Statute, hereby declared severed from the Mercy Statute, may not be constitutionally applied retroactively to the defendant in this case.

The result of severing the Murder Statute from the invalid Mercy Statute is to change the penalty for first degree murder from life imprisonment or death, at the discretion of jury and judge, to mandatory death. A retroactive application of such change of penalty would constitute a denial of due process of law.

The State Ex Post Facto Clause, U.S. Const., Art. 1, § 10 forbids the enactment of any law making a crime greater than it was when committed, by subsequently increasing the punishment. This has been the law of the land from the beginning. Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, 650 (1798).

A pertinent application of this principle appears in Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797, 798–799, 81 L.Ed. 1182 (1937):

"The effect of the new statute is to make mandatory what was before only the maximum sentence.

\*   \*   \*   \*   \*   \*

"[T]he *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.

\*   \*   \*   \*   \*   \*

"It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change."

Thus, it has been held that where the punishment at the time of the offense was life imprisonment or death, at the determination of jury or judge, a change to death alone is *ex post facto* as to such offenses committed prior to the change. Marion v. State, 16 Neb. 349, 20 N.W. 289 (1884); 1 Antieau, Modern Constitutional Law, § 5:135.

It is recognized, of course, that the letter of the Ex Post Facto Clause is addressed directly to legislative action. Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915). But indirectly, via the Due Process Clause of the Fourteenth Amendment, the spirit of the *ex post facto* guaranty, and the resultant ban against the retrospective increase of punishment for a crime, is made to apply as a prohibition against judicial action having such effect. In Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964), the United States Supreme Court stated:

"[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. 1, § 10 of the Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that aggravates *a crime*, or makes it *greater* than it was, when committed.' Calder v. Bull, 3 Dall. 386, 390, 1 L.Ed. 648. *If a state legisla-*

*ture is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.* * * *.*" (Latter emphasis supplied)

The same limitation is imposed upon the United States Supreme Court by the Federal Ex Post Facto Clause, U.S.Const., Art. 1, § 9, and the Due Process Clause of the Fifth Amendment as is imposed upon this Court by the State Ex Post Facto Clause, U.S.Const. Art. 1, § 11, and the Due Process Clause of the Fourteenth Amendment. Accordingly, the consequence is the same, whether the change of penalty is deemed to have resulted from this decision of this Court, or from the decision of the United States Supreme Court in the *Furman* case.

■ For these reasons, we hold that the mandatory death penalty provision of the Murder Statute, standing alone, may not constitutionally be applied retroactively because such application would constitute a denial of due process of law. Otherwise stated, we hold that the mandatory death penalty provision of the Murder Statute may be constitutionally applied prospectively only, and may not be constitutionally applied to any offense committed prior to the date of this decision. Compare State v. Jones, 44 N.M. 623, 107 P.2d 324 (1940); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Great Northern Ry. v. Sunburst Oil and Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932).

## VII.

The foregoing impels the following answers to the questions certified:

(1) The discretionary mercy provisions of 11 Del.C. § 3901 are unconstitutional under Furman v. Georgia.

(2) The mandatory death penalty prescribed in 11 Del.C. § 571 is constitutional; but it may not be applied retroactively to the defendant in this case.

## VIII.

Having determined that the mandatory death penalty provision of the Murder Statute, standing alone, may not be applied retroactively, we are left with the problem of pointing to the statutory, common law, or inherent power of the Superior Court under which sentence may be imposed upon a conviction of murder in the first degree for which the mandatory death penalty of the Murder Statute may not be imposed.[13] That question was not certified and was not briefed or argued by counsel. In order that we may have the full measure of assistance of the especially well qualified counsel involved in this case, the question is reserved. Counsel will be requested to brief and argue the question at the earliest practicable time.

## IX.

The result reached here warrants the attention of the General Assembly for at least two reasons:

First, if the mandatory death penalty for first degree murder, now found to exist in Delaware, is not in accord with the will of the people, the law should be rectified at the earliest possible time.

Second, the result reached here does not necessarily solve the problems created by the *Furman* decision for any state wishing to retain capital punishment. History shows that the mandatory death sentence for first degree murder is also open to

---

13. Four possibilities come to mind: (1) Revival of the 1958 Abolition Statute, 51 Del.L. Ch. 347, the predecessor of § 571; (2) the sentence of life imprisonment authorized by 11 Del.C. § 572 for second degree murder, the next lesser-included of-

fense; (3) the common law power of the court to impose suitable punishment within the exercise of a sound judicial discretion; (4) the inherent power of the court to implement its judgments.

caprice and discrimination in the imposition of the death penalty. The jury's route for the exercise of such caprice and discrimination, historically, is to return a verdict for a lesser-included offense carrying a lesser penalty. There was in this country, almost from the beginning, a "rebellion against the common law rule imposing a mandatory death sentence on all convicted murderers"; juries took "the law in their own hands" and refused to convict on the capital offense. The result was widespread legislative development of the discretionary death sentence throughout the country. See McGautha v. California, 402 U.S. 183, 198, 91 S.Ct. 1454, 1462, 28 L.Ed.2d 711 (1971).

Obviously, any lack of uniform application—any discrimination or caprice in the imposition of the death sentence via the lesser-included offense route—will expose the mandatory death penalty provision of the Murder Statute, hereby upheld, to the same condemnation as was accorded the Mercy Statute in the *Furman* case.

Accordingly, we take the occasion to recommend legislative attention to the subject of capital punishment in the light of the *Furman* decision and its consequences in this State.

WOLCOTT, Chief Justice (concurring in part and dissenting in part):

I agree entirely with the conclusion of the majority in answer to Question No. 1 that, in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States has held in effect that 11 Del.C. § 3901 (the so-called Mercy Statute) is unconstitutional. This ruling is, of course, binding upon us.

I also agree with the conclusion of the majority in answer to Question No. 2 that 11 Del.C. § 571 (the Murder Statute) is severable from 11 Del.C. § 3901 and, therefore, is unaffected by Furman v. Georgia, supra. In addition, I concur with the majority's holding that the death penalty *per se* is not cruel and unusual. 11 Del.C. §

571, therefore, continues to stand as the law of this State and requires the imposition of a mandatory death penalty upon conviction of murder in the first degree.

I disagree, however, with the majority's conclusion that 11 Del.C. § 571 may not be applied retroactively by the courts of this State. I question whether this phase of Question No. 2 is within the framework of the actual question certified; nonetheless, I will consider this aspect since the majority is of the opinion that it is.

The conclusion is based upon the prohibition of *ex post facto* laws by Art. 1, §§ 9 and 10 of the Federal Constitution which in terms forbid only the enactment of such laws. However, as a result of Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the prohibition is now apparently extended to include judicial construction of a criminal statute which has the effect of enlarging a previously prescribed penalty.

I do not think that this. Court by this Opinion has made any such construction. We have held that the Murder Statute and the Mercy Statute are severable and stand independently when subjected to constitutional attack. The Supreme Court of the United States—not this Court—has held that the Mercy Statute is unconstitutional. We, of course, are bound by this decision, but we have not made it. Hence, it seems to me that, under no circumstances, can it be said that this Court has enlarged the penalty for first degree murder. Accordingly, I feel that *Bouie* is inapplicable to the case at bar. In this connection, I note that the mandatory sentence of death has always been the penalty for murder in this State, except for a short period of time.

It seems readily apparent that the Supreme Court of the United States did not consider that Delaware, unlike the other States, had two separate and independent statutes relating to this field—one providing the penalty and the other providing for mercy under some circumstances. The latter has been held unconstitutional since, on

its face, it was susceptible to capricious application, but this holding does not affect in any way our Penalty Statute. It continues to stand as it always has.

In my opinion, therefore, 11 Del.C. § 571 prescribes a mandatory sentence of death. upon conviction of murder in the first degree with respect to all such indictments pending, irrespective of the dates of the crimes on the indictments.

## SUPPLEMENTAL OPINION

In Part VIII of the foregoing Opinion, we reserved for further briefs and argument the identification of the authority of the Superior Court under which sentence may be imposed upon a conviction of first degree murder committed prior to November 1, 1972, for which the death penalty may not be imposed. We have now had the benefit of additional assistance of counsel upon that question.

Both the Attorney General and the Public Defender agree that the penalty in such case must be mandatory life imprisonment. We so hold.

Manifestly, as a matter of either legislative intent, legal concept, or simple reasonableness, a greater crime must be deemed to carry a penalty at least as severe as that prescribed for a lesser-included-offense. The statutory penalty for murder in the second degree is mandatory life imprisonment. 11 Del.C. § 572. The penalty for murder in the first degree may be no less.

The question remains as to the source of the power and authority of the Superior Court to impose a mandatory life sentence for first degree murder.

As this Court has now ruled, the mandatory death penalty of the First Degree Statute, though held to be constitutional prospectively, may not be constitutionally applied retrospectively to any offense committed prior to November 1, 1972. As to any such offense, therefore, the conclusion is impelled that the First Degree Statute,

§ 571, lacks a constitutional penalty provision.

To fill that void, we look to the immediate statutory predecessor of § 571, which was the 1958 Statute abolishing capital punishment and prescribing life imprisonment for murder in the first degree. 51 Del.L. Ch. 347. The penalty portion of § 571 having been found unconstitutional for certain limited purposes, the next preceding Statute revives and becomes controlling for those purposes. The rationale and the result are the same, we think, as in other types of cases in which a repealer statute is found to be invalid, thus restoring its progenitor. See Clark v. State, Del.Supr., 287 A.2d 660 (1972); State ex rel. James v. Schorr, Del.Supr., 6 Terry 18, 65 A.2d 810 (1949); Abrahams v. Superior Court, Del.Supr., 11 Terry 394, 131 A.2d 662 (1957).

Accordingly, for the guidance of the Superior Court in this case and others in like retroactive category, we express the opinion that the penalty to be imposed, upon conviction of the charge of first degree murder, is mandatory life imprisonment; and that the authority therefor is 51 Del.L. Ch. 347.